## DANLEY, AUDITOR, &c. VS. WHITELEY,

Where the Auditor, in the discharge of his appropriate duties, has a discretion in allowing or rejecting a claim against the State and exercises it, his decision cannot be controlled or reviewed by mandamus : but wherever the act to be done is a ministerial one, the performance of which is a plain and positive duty enjoined by law, and essential to the enjoyment or completion of some public or private right, and no other adequate specific remedy is provided, a *mandamus* will lie, at the instance of any person interested, to compel its performance.

Although the Auditor is the general accountant of the State, it cannot be doubted

that the Legislature has the power, by law, to refer to other officers or agents the settlement of accounts or claims against the State, and by whose decision, within the scope of their authority, the State may agree to become bound.

Where by law it is made the duty of any other officer to examine and certify a claim against the State; and the decision of the proper officer is certified to the Auditor, his act in issuing the warrant is purely ministerial.

The certificate of the Secretary of State, under the act of January 11th, 1851, making appropriation for printing and distributing the Acts and Journals of the General Assembly, to the account of the public printer for printing such Acts and Journals, is conclusive upon the Auditor; and he has no discretion to re-open and audit the account so certified, although he allege the settlement and certificate to have been procured by fraud and deception; and from his mode of stating the accounts nothing would seem to be due.

For the adjustment of the accounts in question, the officer whose duty it is by law to examine and certify them represents the State, and there being no appeal or power of review given to the Auditor, the enquiry in the proceeding by *mandamus*, is whether the certifying officer, acting in discharge of his duty, has passed upon the accounts, and not whether he has decided correctly.

The refusal of the Auditor to issue his warrant, in payment of an account certified according to law, cannot be sustained because of the right claimed to retain the amount of alleged previous overpayments. The previous accounts, paid upon vouchers properly certified, cannot be re-adjusted by the Auditor: nor *is there* any law authorizing him to retain, by way of set-off, a debt due from the creditor of the State, and he could only do so by way of deduction in stating and settling an account which he is authorized to audit.

If the State has any claim against the public printer, for breach of his contract or for overpayments or otherwise, she occupies the position of any other suitor and her rights would have to be determined by judicial ascertainment.

### *Appeal from the Circuit Court of Pulaski county.*

### The Hon. W. H. FEILD, Circuit Judge, presiding.

ENGLISH and BERTRAND for appellant. In regard to the substance of the response, we submit that the certificate of the Secretary of State was not *final* and *conclusive* upon the Auditor; that it did not preclude him from looking into the correctness and legality of the account of Whiteley certified to him by the Secretary, that he was not bound by law to issue his warrant for the amount claimed if it was not really due, and that the courts will not compel him to do so, merely because it was certified by the Secretary, if it appear that the claim is illegal, erroneous or unjust.

The Constitution, Art. 5, sec. 24, provides for the election of the Auditor, and declares that he shall perform such duties as shall be prescribed by law. Chapter 23, Digest, prescribes his duties, making him the general accountant of the State (*sec.* 7:) declaring that *all persons* having claims against the State shall exhibit the same with the evidence in support thereof (*sec.* 12;) and giving him the power to examine witnesses, parties, &c., as a court in auditing such claims (*sec.* 14.) It was manifestly the policy of the constitution and the general legislation on this subject, not only to make the Auditor a check upon the Treasurer, but to constitute him a general accountant and quasi court, to pass upon claims against the State, and to guard the Treasury against peculation and false accounts. See *Featherston vs. Adams*, 5 *Eng. Rep.* 163. *State vs. Thompson, use, &c., ib.* .64.

The act of January 11th, 1851, under which the accounts in question were certified by the Secretary of State, declares that the "accounts so certified shall be *sufficient vouchers for the Auditor.*" But inasmuch as these accounts are to pass under the supervision of the Auditor, and to be paid upon his warrant, we submit that it was not the intention of the Legislature to deprive him of his general province as Auditor, and to make the certificate of the Secretary final, absolute and conclusive, but simply to make it a *sufficient voucher*, in the language of the act—to make it *prima facie* evidence of the correctness of the claim, but not to cut off the powers of the Auditor to protect the Treasury, if he saw that the claim so certified was erroneous and illegal in part or *in toto*.

As the Auditor stated in his response that Whiteley had been overpaid on excessive and false charges in previous accounts for printing, that he had left the State, and his securities were insolvent, which facts are admitted by the demurrer to be true, he had the power and it was his duty to withhold the sum so overpaid him, and deduct the amount from whatever might be due him for printing the journals. In an action by Whitely against the State upon the account, the State could surely claim as a set-off the amount of such overpayments on previous accounts; and the

Auditor has the power of a court to adjust and settle his accounts, and allow any balance due, or withhold his warrant if nothing is due. *Digest, ch.* 23, *sec.* 14.

It is further submitted that the Auditor was not bound, or authorized by law to allow Whiteley's charge for printing an *Appendix* to the House Journals. The journal required by the constitution, *Art.* 5, *sec.* 16, to be published, is "the daily record of the proceedings of the House, made up by its clerk, read in the presence of, and approved by the House, and finally signed by the presiding officer, attested by the clerk, and deposited in the office of the Secretary of State;" and the matters printed in the *appendix*, were no part of the journal, nor ordered to be printed.

If the certificate of the Secretary of State is conclusive upon the Auditor, there is an end of the case. But if not conclusive, and he has the power to audit, &c., the claim, he is a *quasi court*, and his judgments cannot be controlled by mandamus. He could only be directed to audit the accounts if he refused. *McIntire vs. Wood*, 7 *Cranch* 504. 3 *Cond. R.* 4. *Amos Kendall, Postmaster General vs. The U, S., in the relation of Stokes et al.,* 12 *Peters* 524.

PIKE & CUMMINS, for the appellee. The employment of a public printer is provided for by Resolution, 12th Nov:, 1850; and it is made his duty to print Acts and Journals. *Acts of* 1850, *p.* 105, 333. Payments are to be made therefor on accounts, audited and certified by the Secretary of State. *Acts of* 1850, *p.* 124.

Auditors and all such officers are executive officers. *State vs. Hutt,* 2 *Ark. R.* 287. 14 *Peters* 497. In discharge of their duties they cannot be controlled by the judiciary and there is no appeal to other officers.

Their acts are conclusive upon the State. *Doe ex dem. Morris vs. Roper,* 3 *East.* 15. 1 *Str.* 481. *Brown Ex'r vs. Pullen, Doug.* 392. *People vs. Collins,* 19 *Wend.* 56. 1 *Hill N. Y. R.* 195. 1 *Brod. & Bing.* 432. 11 *Wend.* 95. 17 *Serg. & R.* 278.

Their action is not subject to review. *Morgan vs. Mather,* 2 *Ves. jr.* 15. *Winter vs. Lethridge,* 13 *Price* 183. *Milligan vs.*

*Dick,* 2 *Ves. jr.* 23.   An award made by the State's own agent is conclusive on *her.*

Printer was bound to print what the clerks furnished him as the journal.

All the accounts referred to in response were *res adjudicata* and not subject to the control of the Auditor.

Whiteley had a right to this writ.   2 *Eng.* 28.   1 *Eng.* 437.  5 *Eng.* 49.   1 *Ark.* 11.

There is no power in the Auditor to retain money from a creditor of the State, until he pays the State.   The reason is obvious, the Auditor cannot exercise *judicial* power.

Mr. Chief Justice WATKINS delivered the opinion of the Court.

It appears from the record before the court on this appeal from the judgment of the Pulaski Circuit Court in a proceeding by mandamus, that at the December term, 1851, of that court, the relator, Whiteley, presented his petition setting forth, in substance, that pursuant to a joint resolution of the General Assembly, approved on the 12th day of November, 1850, making it the duty of the Committee on Public Printing to receive proposals, and contract with the lowest bidder, for the printing of the then present General Assembly, and such other public printing as the pub ¡ lic service might require previous to the meeting of the next General Assembly, and to take bond to the State, with sufficient security, for the faithful performance of the contract, the proposals made by the relator were accepted by the committee as the lowest bid, and he accordingly entered into the contract and gave the bond required; all of which, on the report of the committee, was approved by the General Assembly, on the 20th of November, 1850.   The relator further represented, that in compliance with his contract, after printing the Acts of that General Assembly, the account for which had been paid and settled, he proceeded to print one thousand copies of the journal of the Senate, and one thousand copies of the journal of the House of Representatives, the number of each required by law to be printed and deposited in the office of the Secretary of State: that he printed the Se-

nate Journal from the copy furnished him by the Secretary of
the Senate, containing 452 pages of printed matter, the price for
which, according to contract was $842 58; that along with the
House Journal proper, he was also furnished by the clerk of the
House of Representatives, with copies of certain documents, con-
sisting of the report of the Financial Receiver of the Bank of the
State of Arkansas, including various tabular statements made
out by him, and forming a part of his report; also of the report
of the State Land Agent, and that of the Superintendent of the
Penitentiary, and a petition of the Attorney General, presented
to the Legislature. The relator avers that in consequence of
these documents having formed a part of those accompanying
the Governor's Message, at the opening of the session, or of their
having been referred to appropriate committees and forming the
basis of legislative action, they became a part of the journal of
the House, necessary and proper to be printed, and the clerk,
whose duty it was to do so, furnished him with copies of them,
for the purpose of being printed with the journal, of which they
constituted an integral part, and he accordingly printed them in
the form of an Appendix: that the journal of the House, not in-
cluding the appendix, contained 496 printed pages, the contract
price for which was $932 60, and the cost of printing the matters
contained in the Appendix, estimated according to the establish-
ed rules among printers, with reference to the terms specified in
the contract, the size of the tables being reduced to correspond
with the pages of the printed journal was $1,373 74, amounting
together to the sum of $3,148 52.   The relator further represent-
ed, that having deposited the requisite number of copies in the of-
fice of the Secretary of State, and presented an account of the
items charged for the work, that officer accepted the journals as
printed in due time and in a workmanlike manner, and on the
13th day of August, 1851, delivered his official certificate to the
relator annexed to the account in question, certifying that the
relator's account for printing the journals amounted, according
to his contract, to $3,148 52 in specie, and in script, estimating
it at 90 cents to the dollar, to $3,498 35 due for such printing.

This certificate exhibited with the petition proceeds as follows:

"Mr. Whiteley having made an error in his account for printing the Acts, of $1,279 27, amounting in script at 85 cents to the dollar, at which rate he was paid for printing the Acts, to the sum of $1,505, this latter amount must be deducted from his present account for printing the journals, leaving a balance due to him of $1,993 35, for which sum the Auditor will draw a warrant on the Treasurer in favor of Mr. Whiteley." The relator, after averring the presentation of the account with the certificate of the Secretary of State annexed, to the Auditor of Public Accounts, and his refusal, upon request, to issue his warrant for the amount so certified to be due, and that there remained in the Treasury an unexpended balance of money appropriated on the 11th of January, 1851, to pay for printing the Acts and Journals, more than sufficient to pay the same, prayed for an alternative writ of mandamus to the Auditor, that he issue his warrant, or show cause why he does not do so.

The Auditor in his response to the alternative writ awarded by the court, showed for cause why he did not obey it, that to issue the warrant in favor of Whiteley for the sum demanded, being the balance of $1,993 35, as certified to be due him by the Secretary of State, would be a gross wrong to the State, and a fraud upon the public treasury, in his judgment; and he proceeded to state the facts and reasons, upon which his refusal was predicated, to the following effect: That on the 20th of May, 1851, Whiteley had presented to the respondent, as Auditor, an account for printing the Acts of the General Assembly of 1850–51, and the reports and tables appended thereto, certified to be correct by D. B. Greer, Secretary of State, in which he charged for such printing, $3,584 20 in specie, and the Secretary of State, in his certificate to the Auditor, estimating the value of State script at 85 cents on the dollar, directed respondent to issue his warrant on the Treasurer in favor of Whiteley, for $4,216 70 in payment of the same: That this account being regularly certified by the Secretary of State in accordance with the provisions of the first section of the appropriation act of January 11th, 1851, and re-

spondent presuming that the Secretary of State had discharged his duties faithfully and honestly, in the premises, and not then suspecting Whiteley of fraudulent designs upon the public treasury, treated the certificate of the Secretary of State as a sufficient voucher for the correctness of the account, to authorize him to issue a warrant on the Treasurer in Whiteley's favor for the sum so certified, without requiring further evidence or making an investigation of its correctness. Some time afterwards, respondent having cause to suspect that a fraud had been perpetrated upon the treasury, in the amount charged for printing the Acts, caused the account to be examined, and ascertained that there were overcharges in the items composing the account amounting in the aggregate to $1,301 88 in specie, which having been paid to Whiteley in script, at 85 cents on the dollar, made the over-payment amount to the sum of $1,531 62, of which Whiteley was notified, and informed that it would be deducted from his account for printing the journals. Having detected the fraud in the account of Whiteley for printing the Acts, the respondent then deemed it his duty to cause to be examined various accounts previously presented by Whiteley for public printing under his contract with the State, and for which the respondent had given him warrants on the Treasury, upon the certificates of the officers, whose duty it was to certify and examine such accounts, and which respondent had allowed on the faith of such certificates, he presuming proper vigilance and fidelity on the part of the officers making them, and suspecting no fraud; and on causing such examination to be made, respondent ascertained that Whiteley had been perpetrating a system of gross and flagrant frauds upon the Treasury, in making out his accounts for public printing. When the account in question certified by the Secretary of State for printing the journals was presented to the respondent, as Auditor, for his warrant, he objected to the item of $1,373 64, charged for printing the Appendix to the House Journal, and to which various objections are enumerated in the response, the substance of them being that the journal required by the constitution to be kept and published by the House, is, in the judgment

of respondent, the daily record of its proceedings made up by its clerk, read in the presence of, and approved by the House, and finally signed by the presiding officer, attested by the clerk and deposited in the office of the Secretary of State; that the matters printed in the Appendix, were not part of the proceedings of the House, were not spread upon the journal, were not ordered by the House to constitute a part of the journal, or an appendix to it; nor was there any law, general or special, authorizing the printing of such documents as part of the journal: that all of the matters contained in the appendix, except the petition of the Attorney General, formed a part of the documents accompanying the Governor's message, of which fifteen hundred copies had been printed previous to the meeting of the General Assembly, and there was for that reason no propriety in republishing them: that if the clerk of the House furnished Whiteley with copies of those documents, they were printed copies, not certified by the clerk to be part of the journal : that it was Whiteley's duty as public printer, to certify the account of the clerk for copying the journal, and that Whiteley, in the due performance of this duty, must have had the means of discriminating between the manuscript journal and extraneous matter.   The respondent then proceeds to surcharge and falsify certain previous accounts which had been allowed and paid to the relator, upon the certificates of the Secretary of State, the Governor, and State Land Agent, according as the work had been done for the different Executive offices ; and so of the clerk of the House, and Secretary of the Senate, specifying in detail the overcharges for work done, the false charges for work not done, and the double charges for the same work: the result of which is, according to what would be the respondent's mode of auditing the account, if allowed to do so, that after deducting all those overpayments and the error of $1,531 62 overpaid Whiteley for printing the Acts, and disallowing the charge in the account in controversy, for printing the appendix as part of the journals, the relator, instead of having a just claim against the State for $1,993 35, according to the certificate of the Secretary of State, would stand indebted to the State in the sum of

$794 06 for overpayments upon the various accounts for printing done under his contract, of which the respondent furnishes a re-capitulation.   While the respondent charges that these overpay-ments were procured by a series of fraudulent acts on the part of Whiteley, he disclaims all imputation against the integrity of the several officers before referred to, whose duty it was by law, to examine and certify to the correctness of his accounts.  Though submitting to the court the mode, according to which, in his opin-ion, the account between the relator and the State ought to be stated and audited, the principle contended for by the respondent is, that the court has no power to control his judgment and deci-sion, as Auditor, in matters involving the consideration of issu-able facts, upon which it is made his province to exercise a dis-cretion by the duties of his office and the law of the land.   He represents that Whiteley has left the State, and that he and his securities are insolvent: and even if solvent, it is doubtful, as he is advised, whether an action would lie against the securities for such overpayments; thus raising the question whether he, act-ing for the State, to whom Whiteley is shown to be indebted, ought not to be permitted to retain, by way of set-off, such amount in controversy, as is admitted to be justly due him for printing the journals.

The relator demurred to this response, assigning various causes, all of which necessarily admitting the transactions narrated by him, resolve themselves into a denial of the principle contended for by the Auditor, and the basis upon which the entire response rests, namely, that by law and the duties of his office, he has a discretion, and which the courts cannot control by mandamus, to go behind the settlements of the present and all previous ac-counts of the public printer, and re-open and investigate them, though examined and certified to be correct by the proper offi-cers, appointed by law for that purpose.   And all that part of the response, setting forth the facts and reasons why the Auditor has authority to disregard the certificate of the Secretary of State, vouching for the correctness of the account for printing the appendix to the journal, is demurred to upon the further ground

that while it asserts that the matters printed in the appendix, were not, properly, any part of the journal, it does not deny that they were furnished to the relator to be printed as such by the clerk of the House, whose duty it was to do so, and to whose directions in that respect the public printer had to conform.

The response being adjudged insufficient, and no further showing being made, the court below adjudged that a peremptory mandamus issue, and thereupon granted the prayer of the respondent for an appeal, and made an order that such appeal should operate as a stay of proceedings until the determination in the Supreme Court.

It is desirable to waive any enquiry whether it be the intention or the policy of the statute, *Digest*, Title, Mandamus, *secs*. 10 and 11, to make the allowance of writs of error or appeals from the decisions of the Circuit Courts on writs of mandamus, operating after notice as a stay of proceedings, pending the appeal or writ of error, demandable of right and issuing as a matter of course, or whether they are only to be allowed in the discretion of the appellate court, or whether it is designed to do away with all distinction as to appellate jurisdiction, between those cases where the relator demurs to the sufficiency of the return as at the common law, and those cases, where, traversing it under the statute, he elects to proceed for damages with like effect as if he had brought his action on the case for a false return; and to omit any notice of the refusal of the court below after the alternative writ was awarded, to permit the cause to be docketed and proceed in the name of the State upon the relation of Whiteley, because not examinable upon this appeal; and to disregard all exceptions to the response for informality.

In considering the case upon its merits, it will be assumed, as it is so admitted, that all the accounts certified in favor of the relator, though by different officers, stand upon the same footing of lawful authority in those officers to examine and certify to their correctness. The first section of the act of January 11th, 1851, making appropriation to pay for printing and distributing the Acts and Journals of the General Assembly, provides that,

"All payments therefor shall be upon accounts certified by the Secretary of State, which accounts so certified, shall be sufficient vouchers for the Auditor."

The law, to which no exception will be implied, *Featherston vs. Adams*, 5 *Eng.* 168, is that moneys appropriated are to be drawn from the Treasury upon the warrant of the Auditor of Public Accounts. That officer, *Digest*, Title AUDITOR AND TREASURER, *sec.* 7, is made the general accountant of the State, and required to keep all public accounts, books, vouchers, documents, and all papers relating to the contracts of the State and its debts, revenue and fiscal affairs, not required by law to be placed in some other office, or kept by some other person. He can exercise no judicial function, *Auditor vs. Davies*, 2 *Ark.* 494, but in the adjustment of claims against the State, he is empowered to take testimony or examine the parties, if he thinks it necessary. By section 12 of the same general law, all persons having claims against the State, are required to exhibit the same with the evidence in support thereof to the Auditor, to be audited, settled and allowed, and this must be done within two years from the accrual of the claim. If allowed and there be a subsisting appropriation to pay the claim, the Auditor must give his warrant: if no money be appropriated, he is to grant to the claimant an official certificate of the amount allowed, which then awaits an appropriation. If the claimant be dissatisfied with the decision of the Auditor, he may require the Auditor to refer the same with his reasons to the General Assembly, or the claimant may bring suit against the State, the process in such case being served upon the Auditor, and the statute contemplates that suits by or against the State, shall be considered under his direction. If the claimant succeeds in obtaining a judicial ascertainment of a demand in his favor, it is made the duty of the Auditor to lay a copy of the judgment before the General Assembly, to the end, that an appropriation may be made to satisfy it. Such, in comprehensive terms, are the stututory provisions on the subject.

It cannot be doubted that the Legislature has the power by law, to refer to her officers or agents, other than the Auditor, the

settlement of accounts or claims against the State, and by whose decision, within the scope of their authority, the State may agree to become bound. It might be well to adhere to the policy of making the Auditor the general accountant of the State, and preserving under the supervision of one office, the details of whose duties become systematized, the evidences and documents relating to the public finances. But there may be exceptions to such a policy. If the General Assembly deems it expedient to place at the disposal of the Governor, as the head of the Executive department, a contingent or secret service fund, the nature of the trust reposed in him implies that the Auditor should issue his warrants, upon the requisition of the Governor, without question or hindrance. The same principle might be applicable to the mode of auditing the ordinary contingent expenses of the judiciary; and with equal reason it would be made the imperative duty of the Auditor to issue his warrants for the pay and mileage of members, and contingent expenses of the two branches of the General Assembly, upon the certificate of such of their officers as might be appointed for that purpose. Because, though confidence, no matter where reposed, is liable to mistakes or wilful abuse, there is always some measure of responsibility attending such abuse, and it is of much greater consequence that the dignity and usefulness of each of the departments of the government should not be impaired by conferring upon any one officer belonging to either a discretion to withhold or delay the compensation of other public servants necessary for their subsistence.

Where the Auditor, in the discharge of his appropriate duties, has a discretion in allowing or rejecting a claim against the State, and exercises it, his decision cannot be controlled or reviewed by mandamus. It appertains exclusively to the sovereign power to provide the mode and means by which the claims of public creditors are to be ascertained and liquidated, and without the express consent of the State allowing herself to be sued, such a case is not one of judicial cognizance. Nor does the submission of the State to an ordinary suit at law for her alleged indebtedness, change, in this respect, the theory of a mandamus.

The assumption of such a jurisdiction over the accounting officers of the treasury, would not only disturb their regular business, but it would have the effect of drawing indirectly to the courts, the irresponsible power and impossible duty of regulating the fiscal affairs of the government.

But there is a marked distinction everywhere recognized between the exercise of discretion and a ministerial act, the performance of which is a plain and positive duty enjoined by law, and when essential to the enjoyment or completion of some public or private right, and no other adequate specific remedy is provided, the authorities concur in holding that a mandamus will lie, affording a prompt and efficient remedy, at the instance of any person interested, to compel its performance. If the Auditor should refuse to pass upon a claim presented to him, which the claimant desired to have done, so that if rejected he might be enabled either to bring suit against the State, or appeal to the General Assembly, we apprehend the jurisdiction would not be questioned, to compel him by mandamus to exercise his discretion in deciding upon the claim; and so, if requested by the claimant to refer the same with his reasons for rejecting it to the General Assembly. On the same principle, if the Auditor, after having allowed a claim, should refuse to issue his warrant, because in doubt whether the subject be embraced in the terms of any previous appropriation, the proper court, if called upon to interpret the law, would not hesitate to treat the issuance of the warrant in such case as a mere ministerial act of the Auditor, consequent upon his own decision and involving no discretion whatever. *Byrd vs. Conway, Auditor*, 5 *Ark*. 436. *Tully Ex parte*, 4 *ib.* 220. Those cases go farther, in holding that the Auditor will be compelled, by mandamus, not only to audit but to allow the salaries of public officers and agents, the amounts of which have been fixed by law and no legal excuse is shown for his refusal. See also *Page vs. Hardin*, 8 *B. Mon.* 648. In *Hawkins vs. the Governor*, 1 *Ark.* 570, it was held that a mandamus could not issue to the Governor, because being the chief executive of the State, a due respect for his station forbade an attempt to hold him, in that mode,

amenable for his acts to the judiciary. But no such considera-
tion has been extended to the Auditor ; for though belonging to
the executive department, his acts are not those of the chief ex-
ecutive, since according to our political organization, he is not
appointed by, or responsible to the Governor.

It is a question of some difficulty whether the submission 'of the
State to be sued by her creditors, affords an adequate remedy
superseding the summary and specific one sought to be obtained
by mandamus. The suit permitted against the State, is in the
nature of an appeal from the adverse decision of the Auditor, and-
must be an ordinary suit in form, and in substance a direct pro-
ceeding against the State by name. It was not designed to make
the writ of mandamus a substitute for the action of debt or as-
sumpsit, or a bill for an account. Here the specific relief asked
for is the issuance of the Auditor's warrant, the direct fruits of
which may be to enable the relator to realize a mere money de-
mand from the treasury: so that the difficulty suggested is forci-
bly presented. Our opinion is, that although the privilege of
suing the State ought to influence the court in refusing to award-
the writ, in all cases where it may be doubtful whether the officer
or inferior magistrate has a discretion or acts ministerially, yet
it does not take away the remedy where the distinction is clear,
and the act to be done is purely ministerial, a duty enjoined by
law, which the relator has a right to demand, though by the per-
formance of it, the interests of the State may be remotely or con-
sequentially affected. Because upon principle, and unless this
be so, the Auditor could withhold the regular salary of any pub-
lic officer; he could defeat the execution of the laws, by refusing
to obey the requisition of the Governor upon the contingent fund;
and by disregarding the certificate of the proper officer of either
House, he might force members of the General Assembly to
bring suits against the State for their per diem and mileage.

It seems to be conceded in the argument, that upon the facts
set up in the petition, none of the material allegations of which
are denied by the response, the relator has shown himself enti-
tled to the writ. The respondent sought to avoid the legal con-

clusion from those facts by going into an investigation of the series of accounts between the relator and the State; and the question upon which the decision of this cause turns, is not whether, if the facts asserted by the respondent be true, the relator is legally or equitably entitled under his contract, to receive any further payments from the State, but it is whether the Auditor has the right to set up those facts in this proceeding. Although no reason is perceived why the accounts of the public printer should not have been referred for settlement to the office of the Auditor, as coming within the sphere of his appropriate duties, the Legislature thought proper to refer them to the Secretary of State or other officers. The accounts so certified are made sufficient vouchers for the Auditor, for the issuance of his warrants, to the end that payment may be made. It is well settled that where an authority or discretion is conferred upon an officer, whether the duties be in their nature executive or judicial, his decision within the scope of his authority, though erroneous, is final and cannot be collaterally called in question. The judge or officer, if the decision has not been acted upon or passed beyond his control, may recall it if he believe it to be erroneous or made in mistake. When the Auditor examines an account, referred by law to his office for settlement, and makes an award in favor of the claimant, it is prima facie conclusive upon the State and all other public officers, because the government has agreed to become bound by his decision, he being responsible to the appointing power for any dereliction of duty. The same reasoning applies to an award made by the Secretary of State, or any other person selected by the State as her agent for that purpose: nor will a court undertake to control the discretion of one, any more than of the other. Because the Auditor is the general accountant, it does not follow, as we have seen, that special authority may not be delegated to other officers or agents, to audit accounts against the State. Those exceptions to his general duties cover a large portion of the public expenditures. Unless the power of revision is given by law, he does not derive it from the circumstance that a warrant must be issued by him. When the

decision of the proper officer is certified to him, his act in issu-
ing the warrant is as purely ministerial as that of the Treasurer
who pays it. Among the adjudged cases that might be cited in
support of these views, it will be sufficient to refer to the elabo-
rate one of *Kendall vs. The United States,* 12 *Peters* 524, where
Stockton & Stokes, having disputed claims for extra services un-
der mail contracts, made with a previous Postmaster General,
which his successor refused to admit, Congress at their instance
passed an act by which the solicitor of the Treasury was em-
powered to settle and adjust their claims for extra services, and
directing the Postmaster General to credit them with whatever
sum or sums of money, if any, the solicitor should decree to be
equitably due them. Mr. Kendall being notified of the award,
refused to give credit for a part of the sum reported to be due to
Stockton & Stokes, and upon their relation a peremptory man-
damus was granted to compel him to enter a credit on the books
of the Postoffice Department for the whole amount. The Su-
preme Court, in maintaining the jurisdiction to administer the
law for the protection of individual rights under a constitutional
government, use some remarkable language, reiterated in *Deca-
tur vs. Paulding,* 4 *Peters* 516, not called for in reference to the
powers of the executive in this State, but establishing fully the
principle laying at the foundation of the present case, that, though
to be cautiously dealt with, it must always be a judicial question,
whether the particular act involves executive discretion, or is a
mere ministerial duty. The court had no hesitation in deciding
that under that law the Postmaster General was vested with no
discretion or control over the decisions of the solicitor, no appeal
or review being provided by it: and that the entering of the cre-
dit was "a precise, definite act, purely ministerial, and about
which the Postmaster General has no discretion whatever." It
can make no difference that here the act of the General Assem-
bly making the submission to the Secretary of State, was passed
in advance of the claim for services to be rendered by the relator
under his contract.

The strong position taken by the response is, that the relator

having procured the settlement of the account in controversy and of previous accounts by fraud or deception, practiced upon the officers who certified them, the court ought not to aid him in obtaining the relief he now seeks in this or any other proceeding. Upon examination this will be found to be another phase of the same enquiry, whether the Auditor is estopped by the decision of the Secretary of State from urging the objection.    The law made it the duty of the Secretary of State to adjust and settle the accounts of the public printer.    If the Auditor had any implied power of revision, there must have been a corresponding duty resting upon him to exercise it; and then, according to his own showing, he would appear to have been repeatedly derelict in suffering accounts to pass into warrants without any investigation, trusting, as he did, to the correctness of the certificates of the officers who examined them.    No such duty devolved upon the Auditor; and the construction of the law which acquits him of imputation, must also prove that the responsibility of certifying these accounts rested upon other public agents, and with which he had no concern.    Here then the respondent asserts that there was fraud or mistake in a matter about which it was not his province to judge; while the certificates of other agents, selected by the State for the purpose of examining and settling the accounts assert, and supposing them all to be involved in the same enquiry, would continue to assert that they are correct as certified, and free from fraud or mistake.    It is a plain proposition that the statement of the officer, having authority to bind the interests of the State, is to be received in preference to the assertion of the one to whom no such authority has been delegated. This court, in the *County of Ouachita vs. Sanders*, 5 *Eng.* 472, where a Circuit Court had certified a bill of costs in a criminal prosecution to the county court for payment, though some of the items of charge allowed by the Circuit Court were of rather an extraordinary character, said: "So long as the order allowing the claim and certifying it to the county court remains, it is obligatory and conclusive as to the amount of the costs and charges to be allowed." And so it had been taken for granted in *The*

*County of Pulaski vs. Irvin*, 4 *Ark.* 473. No doubt, it would be proper for the Auditor, as a vigilant public servant, if he knew ·or suspected an error in an account certified to him, to refer it back to the certifying officer for correction or further enquiry before issuing his warrant: but he cannot overrule the decision of that officer by persisting in a refusal to abide by it.

This conclusion, when arrived at, settles all other questions in the case really dependant upon it. As it regards the printing of the appendix, the probability is, from the references to the practice, made by counsel on either side, that documents have sometimes been inserted in the appendix, as often by accident or caprice of the clerks, as by the order of either House; and one of the beneficial results of this controversy may be, to induce the General Assembly to prescribe some definite and uniform rule on the subject. But for all the purposes of the present enquiry, the account presented by the relator appears to be doubly fortified, as to this item of charge, by the official sanction of the clerk of the House and the certificate of the Secretary of State.

The refusal of the Auditor to issue his warrant cannot be sustained because of the right claimed to retain the amount of alleged previous overpayments to Whiteley. Independent of any objection to the re-opening of settled accounts, they all stand upon the same footing with the account in controversy. If being regularly certified they were proper vouchers to the Auditor, they continue to be so. We have no statute authorizing the Auditor to retain, by way of set-off, a debt due from a creditor of the State; and he could only do so by way of deduction in stating and settling an account, which he is authorized to audit. Of course, if Whiteley has not complied with his contract, it is to be presumed that he and his securities are liable in an action by the State for any breach of it: and that if overpayments have been made to him by mistake, they may be recovered back. If the set-off is claimed on the ground of their insolvency, the State occupying the position of any other suitor, who had contracted improvidently, it would have to be determined by judicial ascertainment. In a direct proceeding in chancery on behalf of the State, an in-

88

junction, if prayed for against Whitcley, could only be granted or perpetuated according to established rules of law and by the decision of a competent court.   If the Auditor has the right, claimed for him by virtue of his general powers and duties, of refusing to issue his warrant for payment of claims allowed by other officers, in whom had been vested by special laws a discretion to examine and adjust them, the converse of the proposition must also be true; and it would follow, if his revising power be admitted, that the Auditor, in all such cases, must have an uncontrolled discretion of issuing his warrant in payment of claims which the proper accounting officer had rejected.   In any view of the case, we conclude that the judgment ought to be affirmed.