CASE 36—PETITION EQUITY—OCTOBER 15.

# Baldwin v. Commonwealth and Commissioners of Sinking Fund.

### APPEAL FROM FRANKLIN CIRCUIT COURT.

1. A CONDITIONAL ACCEPTANCE OF THE HIGHEST BID being assented to and accepted by the bidder, the sale was thereby made effectual.

2. SALE OF TURNPIKE STOCK BELONGING TO THE STATE BY COMMISSIONERS OF THE SINKING FUND held to be valid and binding on the state, although the commissioners of the sinking fund refused to execute the sale and the legislature afterward repealed the act authorizing the sale to be made.

   The legislative act directed the commissioners of the sinking fund to sell the stock owned by the state in turnpike-road companies, and the commissioners having, in accordance therewith, advertised for sealed bids for the purchase thereof, made a conditional acceptance of a bid offered, and verbally directed their agent to notify the bidder of their action, which being done the bidder accepted in terms the conditions imposed, and so notified the commissioners. *Held*, that the contract was completed, and the title passed, and the right of the parties became fixed when notice of the· acceptance of the modified terms was received by the board of commissioners.

   *It was not essential* that the records of the board of sinking fund commissioners should show that notice of its action was ordered to be given to the bidder.

   The execution of bond by the bidder with surety can not be regarded as a condition precedent, the performance of which was necessary to invest the purchaser with the right to the property. (Duncan v. Lewis, 1 Duvall, 183; Thompson v. Gray, 1 Wheaton, 75; Crawford v. Smith, 7 Dana, 61.)

3. *It was not a waiver of his rights as purchaser* for him to apply for and accept the state's proxies to vote the stock he had purchased; it was not inconsistent with his claim.

4. *The state is bound by its contracts as well as the citizen.*

   The act under which the turnpike stock was sold is a part of the agreement.

5. *The legislature could not, by repealing the act authorizing the sale, impair the obligation of the contract* or deprive the purchaser of his right to

enforce it against the commissioners according to its terms. (Blair v. Williams and Lapsley v. Brashears, 4 Littell, 66.)

The commissioners of the sinking fund are compelled to execute the contract and make the transfers of the stock as if the act authorizing the sale had not been repealed.

W. H. WADSWORTH, . . .⎫
T. N. & D. W. LINDSEY, ⎬ . . . . . For Appellant,
W. P. D. BUSH, . . . .⎭

CITED

Act of March 7, 1871, Session Acts 1871, vol. 1, p. 41.
General Statutes, chap. 21, sec. 3, p. 245.
6 Dana, 48, Willis v. Willis.
7 Dana, 61, Crawford v. Smith.
1 Duvall, 184, Duncan v. Lewis.
1 Wheaton, 75, Thompson v. Gray.
3 Curtis, 471.           Story on Agency, 467.
4 Littell, 34, Blair, &c. v. Williams.
2 Wheaton, 197, Rutherford v. Greene.
9 How. 390, Taylor v. Merchants' Fire Ins. Co.
2 Sim. 189–99, Demcuft v. Netterville.
2 Sim. 304, Colt v. Netterville.
2 DeG. & Sm. 11, Shaw v. Fisher.
5 DeG. & M. & G. 596.
3 DeG. & Sm. 310, Wynne v. Price.
1 Story's Eq. 11th ed. secs. 724, *a*, pp. 776, and 724, *b*.
14 B. Mon. 332, Sweeney v. Owsley.
18 C. B. 845, Walker v. Bartlett.
10 Bush, 81, City of Covington v. The Cov. & Cin. Bridge Co.

JOHN RODMAN, Attorney General, ⎫ . . . For Appellees,
THOMAS F. HARGIS, . . . . . .⎭

CITED

Act of March 7, 1871, Session Acts, vol. 1, p. 41.
Newman's Pl. & Pr. p. 619.
Chitty on Contracts, pp. 251, 200.
9 Bush, 716, The Commonwealth v. Todd, &c.
2 Met. 339, Slone v. Slone.
4 Met. 110, Hutchings v. Moore.
4 Mass. 405, Hussey v. Thornton.
1 Parsons on Con. 6th ed. pp. 64, 58, 548, 42.
2 Parsons on Con. pp. 635, 799.
9 Bush, 195, Murphy v. The City of Louisville.

2 Cent. Law Journal, p. 367.
4 Wash. C. C. 454, Kingston v. Kincaid.
3 Pet. 428.        4 Eq. 9, Hobbs's case.
3 Met. 80, Hutcheson v. Blakeman.
4 M. & W. 155, Jordan v. Norton.
2 Met. 309, Moxley v. Moxley's adm'r.
9 How. 390, Taylor v. Merchants' Fire Ins. Co.
4 H. & N., Cornish v. Abington.
21 Barb. 655, People v. Rochester.
11 Allen, 349, Andrews v. Lyon.
28 Cal. 23, Davis v. Davis.
14 Ohio, 102, Morgan v. Spangler.
17 B. Mon. 480, Comm'rs Sinking Fund v. Theobald.
21 Cal. 80, Donahue v. Cromartie.
11 Barb. 652, Robertson v. Ketchum.
34 Ill. 69, Cooley v. Willard.
26 Wend. 192, Delefield v. The State of Illinois.

JUDGE COFER DELIVERED THE OPINION OF THE COURT.

March 7, 1871, the general assembly passed an act authorizing and directing the commissioners of the sinking fund to sell all the stock owned by the commonwealth in the various turnpike-road companies in the state.

The commissioners were authorized to sell at such times, in such manner, for such price, on such terms and conditions, and upon such time, not exceeding ten years, and upon installments as they might deem best calculated to secure the highest price and the best interest of the state; and in order to facilitate the sale and the discharge of the duties imposed by the act the commissioners were authorized to appoint one or more agents. It was also provided that no sale should be made until a careful estimate was made by the commissioners of the salable value of all the stock owned by the state in each of the several roads in which the state was interested, "and a *minimum* price fixed upon the stock in each, below which no sale should be made, and which price should be such as to insure to the state the realization of at least two hundred thousand dollars for her entire property in turnpike roads."

It was further provided that in making sales the commissioners should give preference, and first make an effort to sell the stock to the county courts of the counties in which the roads were respectively situated, and in case such courts should fail to purchase, then sales should be made to individuals or corporations.

On the 10th of May, 1871, the commissioners appointed an agent to ascertain and report the actual value of the turnpike stock owned by the state in each turnpike-road company.

The agent first appointed having failed to act, resigned, and on the 7th of September another was appointed in his place, and reported, fixing a valuation on the stock in twenty companies, which valuation amounted in the aggregate to $279,782. On the 2nd of November the valuation reported by the agent, less ten per cent, was fixed by the commissioners as their valuation, and they ordered their secretary to advertise for sealed bids for the purchase of the stock held by the state in the several companies, to be received up to the 2d of December.

The appellant, W. W. Baldwin, bid for 880 shares in the Maysville and Mt. Sterling company the sum of $12,029.63, and for $259\frac{48}{100}$ shares in the Maysville and Bracken company the sum of $15.01 per share, making $4,894.80, each bid being above the *minimum* price fixed by the commissioners upon the stock in these companies respectively.

On the 4th of December the commissioners met, all being present, and accepted appellant's bids by a vote of four for and one against acceptance, but the acceptance was with this proviso, "that the state is entitled to its portion of the money and securities now (then) in the hands of the treasurer or other officer or agent of said companies, and the further proviso that the state shall be entitled to the dividends to be declared on each of said roads in January, 1872."

It was also ordered at the same meeting that the agent of the commissioners be directed to prepare contracts (bonds)

to be executed by the purchasers of stock, and that he submit them to the board; and it also appears, though not from the minutes of the proceedings of the board of commissioners, that the agent was, at the same time, directed to give notice to bidders of the provisos affixed to the acceptance of the bids.

On the 7th of December the senate passed a resolution in these words:

1. "That the commissioners of the sinking fund are requested to withhold all propositions for the sale of state stock in turnpike roads in this commonwealth."

2. "That no proposition be consummated for the sale of the stock until final action is had by the general assembly upon the bill just passed the senate on that subject."

And on the same day the board of commissioners met and resolved "that all action in regard to sales of turnpike stock of the state be suspended, and that J. A. Dawson, agent of the board, be directed to cease action as such."

And on the 10th of February, 1872, the bill referred to became a law. That act reads as follows:

1. "That an act entitled 'an act authorizing and directing the sale of the interest and stock owned by the state of Kentucky in turnpike-road companies,' approved March 7, 1871, be and the same is hereby repealed.

2. "This act shall take effect and be in force from its passage."

On the 16th of July, 1872, the commissioners employed counsel, and directed him to examine their proceedings relating to the sale of the stock and give his opinion whether they were bound to carry out any or all of said contemplated sales. The attorney employed presented his opinion on the 12th of August, to the effect that, the statute under which they had acted having been repealed, they had no alternative but to cease to act in the matter. "And upon consideration of the subject it was resolved by the board that it had no further

power in the premises, their authority having been withdrawn by the repeal of the act under which the board was acting."

Actions having been brought in April, 1873, by the commonwealth against the Maysville & Mt. Sterling, and Maysville & Bracken companies to recover dividends declared after January, 1872, upon the stock of the state in those companies, they filed the affidavits of their treasurers stating that the appellant, without collusion with them, was making claim to the dividends sued for, and that they were ready to pay the amounts as the court might direct; and upon the motion of said companies appellant was made a defendant, and he thereupon answered and made his answer a cross-petition against the commonwealth and the board of commissioners of the sinking fund.

He alleged that he was the owner of the stock, the dividends of which were sued for by the commonwealth, by purchase from the commissioners of the sinking fund, made under the act of March 7, 1871; that said commissioners, "in strict pursuance of the powers conferred on them, and the duties commanded by the provisions of said act, and after fully complying with all the directions of said act, duly and lawfully invited proposals in writing for the purchase of said shares, and of all the shares of stock held by the state in turnpike roads or turnpike-road companies;" that he bid for the shares then held and owned by the state in said Maysville & Mount Sterling and Maysville & Bracken companies, offering the sum of $12,029.63 for the stock in the former, and $15.01 per share for the stock in the latter, and that the prices so bid were above the *minimum* fixed thereon by the board; that his bids were received, opened, and accepted with the provisos already stated; that he was notified by the duly appointed agent of the board of the acceptance of his bids with the provisos, and that he "accepted the same in terms, and told the agent to prepare his contracts accordingly, and he would execute them

in such manner and with such sureties as might be satisfactory
to the said board, of all which said board had due notice." He
also alleged that the agent prepared the contracts accordingly,
and that he (appellant) signed them, and in company with the
agent went to the secretary of the board and deposited them
with him, and that some nine or ten days thereafter he caused
them to be signed by sureties amply sufficient to secure pay-
ment; but that "before he could obtain the signatures of his
sureties, and after the delivery of his said contracts (of which
the said board had due notice), the said board met on the same
day, December 7th, and passed" the resolution of that date
already quoted. He also alleged that the contracts (bonds)
had continued in possession of the secretary of the board; that
he has always been ready and willing, in good faith, to comply
with his contract, and to perform every condition, and offered
to do so, of all of which said board had due notice, but' said
board not intending to comply with its contract of sale to him,
but disregarding and denying the binding obligation of said
contract, put it out of his power to do any thing more subse-
quent to the making and completing the contract of sale and
purchase than he has done or offered to do; that he tendered
the full amount of the principal and interest of his bond first
falling due at its maturity, but the tender was refused, the
board having previously given him notice that they would not
accept payment or comply with their contract of sale.

Upon these and other allegations not necessary to be stated
the appellant claimed that he was entitled to the stock and to
the dividends sued for by the commonwealth, and he prayed
for a judgment for the dividends, and that the board of sink-
ing fund commissioners might be compelled to accept payment
and transfer to him the stock.

To this answer and cross-petition both the commonwealth
and the commissioners appeared and answered. They denied
that the appellant was the owner of the stock, or was entitled

to the dividends. They averred that appellant bid for the stock as stated, but never became the purchaser thereof in pursuance of the act of assembly; they denied "that the commissioners of the sinking fund, under the authority of the said act, accepted the bids of the said Baldwin for the stock in said roads, because they say that the commissioners were not unanimous in their action, a portion voting for and a portion of them against the acceptance" thereof, and for the same reason they denied that the agent referred to was lawfully appointed, and also denied that he presented appellant's bonds to them. They denied that appellant, or any one for him, "notified said board that he would sign obligations satisfactory to them;" or that any bonds whatever executed by him, with or without sureties, were ever presented to them for acceptance at any time whatever for said stock, or any part thereof; or that they had any knowledge or notice of the alleged delivery by said Baldwin to the auditor and secretary of the board of any bonds whatever executed for said stock. ·

They also set up the resolution of the senate of December 7, 1871, and the act of February 10, 1872, already quoted, and say that since the passage of said resolution and act the commissioners have ceased to take any further action in regard to said stock in turnpike roads.

They also alleged that after the 15th day of December, 1871, and after the alleged purchase of said stock, the appellant waived and surrendered all claim to the stock in both companies, and on that day he applied to the governor of the state to appoint him, and he was appointed agent to cast the vote of the state as owner of 880 shares of stock in the Maysville & Mount Sterling Company, and 259 shares in the Maysville & Bracken Company, and as such agent did cast the vote in the election of directors in said companies on the     day of     1872, and that he applied for a similar appointment to vote the same stock in 1873, which was refused; that for

that year the proxy was given to Robertson, and that appellant solicited Robertson to cast the vote of the state for him (appellant) for director of both roads, and that he then fully recognized the state as the owner of the stock.   But the answer contains no denial of the allegation that the appellant was notified by the agent of the board of the acceptance of his bids with the two provisos stated, and that he (appellant) then "accepted the same in terms, and told the agent to prepare his contracts accordingly, . . . of all of which said board had due notice."   It seems to us, therefore, that it is established by the pleadings that the appellant did accept the modification of his bids made by the board, and that the board had due notice of such acceptance, and that so far as the validity of the sale and purchase depends upon such acceptance and notice, it is established.

Nor is it denied that the appellant has always been ready and willing to comply with his contract, or that "not intending to comply with its contract of sale to him, but disregarding and denying the binding obligation of said contract, the board put it out of his (appellant's) power to do any thing more subsequent to the making and completing the contract of purchase than he has done or offered to do," or that he tendered the amount of principal and interest of the first bond at maturity, or that the board had previously given him notice that payment would not be accepted.

The first bond fell due, according to the terms of sale, December 4, 1872.

The actions were consolidated and transferred to equity, and upon final hearing the appellant's cross-petition was dismissed and the stock and dividends adjudged to belong to the commonwealth for the benefit of the sinking fund, and from that judgment this appeal is prosecuted, both the commonwealth and board of commissioners of the sinking fund being made appellees.

Several .grounds are relied upon to sustain the judgment, the *first* of which is that there never was such meeting of the minds of the parties in agreement at the same time to the same thing as made the *aggregatio mentium* essential to a contract; *secondly,* that if there was such an agreement, it was invalid, because the commissioners did not comply with certain provisions of the act which were conditions precedent to the sale; and *thirdly,* that if there was a valid sale, the appellant is estopped by his application for and acceptance and use of the state's proxy to vote the stock in 1872, and his application for a like agency to vote it in 1873, whereby he recognized the state as the owner of the stock; and *finally,* that the act under which the sale was made, if made at all, having been repealed, and the title to the stock being in the commonwealth, which can not be sued, no relief can be afforded by the courts, even though it may appear that but for such repeal the appellant would be entitled to relief.

1. Did the minds of the parties meet in agreement to the same thing at the same time?

The bids of the appellant, with the action of the commissioners thereon on the 4th of December, 1871, did not constitute a contract, because his bids were not accepted as made. The provisos annexed to the acceptance constituted a new proposition by the commissioners to sell him the stock on the modified terms thus indicated, and he was at liberty to accept or reject it. The agent of the commissioners was directed to notify bidders of the new proposition, and the allegation of the appellant that the agent did so notify him is not denied, and must be taken to be true. The agent having notified him, he alleged that he then accepted the proposition in terms, and that of this the commissioners had due notice; and this being also undenied, is established as true. It thus appears that the appellant had notice of the proposition to modify his bids, and that the commissioners had notice of his acceptance of that

modification. This, according to universal authority, was an *aggregatio mentium*, and completed the contract.

It is insisted, however, that the commissioners, who are by law made a body corporate, can only speak by their records, and that as their records do not show that the agent was directed to give notice to bidders of the modifications proposed by them, the agent had no authority either to give notice or to receive notice from bidders of their acceptance. The record of the commissioners shows the terms of their acceptance, and that they directed contracts to be prepared in accordance therewith, which clearly manifested their purpose to complete the sale if the terms were accepted;. and it must be assumed that they intended that these terms should in some way come to the knowledge of the appellant; and as they did come to his knowledge, and he accepted them, and the commissioners had notice of such acceptance, it is not material whether the agent who gave the notice was specially directed to do so by an order entered on the record or not. It is clearly established that they did while in corporate session direct him to give notice to bidders.

It is argued, however, that, if the terms of the commissioners were accepted, and they were notified of such acceptance, the contract was still incomplete until bonds with approved surety were given for the price and accepted according to the advertised terms of sale and the requirement of the act under which the sale was made. The appellant claims that he did execute bonds as required as early as the 16th of December, and place them in the hands of the secretary of the board of commissioners to be laid before them, and that, if not, then the commissioners put it out of his power to do so, and excused his failure by their resolution of the 7th of December, which we have already quoted in full.

We do not think the facts warrant the conclusion that bonds were ever tendered to the commissioners, and the ques-

tion then arises whether the execution of bonds according to the advertised terms of the sale and the provisions of the act was necessary to complete the sale, or was it completed when the commissioners received notice of the acceptance of their modification of the terms of appellant's bids? We think the contract was completed, and the title passed and the rights of the parties became fixed when the notice of the acceptance of their modified terms was received by the board of commissioners.

. The correctness of this conclusion is, we think, conclusively established by the cases of Duncan v. Lewis (1 Duvall, 183), Thompson v. Gray (1 Wheaton, 75), and Crawford v. Smith (7 Dana, 61).

The facts in Duncan v. Lewis are these: Wright bought of Chalmes a lot of mules at a fixed price on a stipulated credit. Chalmes was to keep the mules for a few weeks, and then deliver them to Wright, on the execution of his notes, with good security, for the price. Subsequently the mules were delivered to Wright, and he executed his notes to Chalmes for the price, with Lewis as surety. Between the date at which Wright contracted with Chalmes for the mules and the date of their delivery and the execution of the notes for the price, Wright and Duncan formed a partnership, and by the terms of their agreement the mules purchased of Chalmes were to become partnership property, and they were so treated by the partners.

Lewis having been compelled to pay a large sum on the notes to Chalmes, sued Duncan for restitution on the ground that he was a dormant partner in the purchase of the mules.

The decision turned, in part at least, upon the question whether the title to the mules passed to Wright at the date of his contract with Chalmes, or at the time when the transaction was completed by the execution of the notes and the delivery of the mules; and the court held that according to the legal effect of the character and terms of the contract of pur-

chase the title vested in Wright on the day on which the con-
tract was made, and that the mules were thereafter at his risk.
The court in that case quote with approbation from the opinion
in Crawford v. Smith (7 Dana, 61), as follows: "A legal title
may pass by the terms or the legal effect of the contract, and
nevertheless, in judgment of law, the vendor may have a
right to retain the possession until the vendee shall have per-
formed some act which, by express stipulation or legal intend-
ment, must be done before he can have a right to the possession
of that to which he had acquired the legal title. Thus a simple
sale of a horse for a stipulated price, to be paid on delivery, or
without any agreement as to the time of payment or delivery,
or upon an agreement to execute a promissory note for the price
simultaneously with the delivery, would, *per se*, vest the title
to the horse in the purchaser."

In the case of Duncan v. Lewis and in the supposed case in
Crawford v. Smith, as well as in the case in hand, the agree-
ment of the vendee in regard to the payment or security of the
price was to be performed after the making of the contract;
yet in both of those cases it was held that the contract was
complete, and the title passed to the purchaser at the making
of the contract and before performance of his undertaking in
regard to security for the price.

The case of Thompson v. Gray, *supra*, furnishes a striking
illustration of the same principle. Gray purchased at an
agreed price 2,500 lottery tickets, for which he agreed to
give his bond with approved security on the delivery of the
tickets. The tickets were in books, and the requisite number
was selected and set apart for him, but twelve of said books,
containing one hundred tickets each, were not delivered. The
drawing was had, and one of the tickets so purchased and set
apart for Gray, but not delivered, drew a prize of $20,000. Sev-
eral days thereafter Gray tendered bond with sufficient surety
for the agreed price of the tickets, and demanded their de-

livery, which was refused, and he brought trover to recover them.

Chief Justice Marshall delivered the opinion of the court, and thus stated the question to be decided: "Was the purchase and sale of the twelve books not delivered so complete that the tickets had become the property and were at the risk of Robt. Gray?" and it was decided that it was, the court saying, "The stipulation respecting security could not in such a case be considered as a condition precedent, on the performance of which the sale depended." So in this case the stipulation respecting the execution of bonds with security can not be considered a condition precedent, the performance of which was necessary to invest appellant with a right to the stock. If he failed to give the bond stipulated for he was liable for the price, and the stock in the hands of the commissioners was subject to a lien for its payment. If he had been called upon to execute bond in accordance with the terms of his contract, and had failed or refused, such failure or refusal would have been an abandonment of the contract, and the title would have revested in the state.

But no such demand and refusal having been shown, or even claimed, and the allegation of appellant's cross-petition that the commissioners, not intending to comply with the contract, but disregarding it, and denying its binding obligation, put it out of his power to do more than he has toward completing the purchase, and that he had at all times been ready and willing to perform his part of the contract, and had tendered the first installment of purchase-money at maturity, being undenied, when taken in connection with the resolution of the commissioners of the 7th of December, leave no room for saying that he has been so in default as to furnish evidence of waiver or abandonment, or of a refusal on his part to perform his obligation.

2. It is alleged in the cross-petition, as already quoted, that

the commissioners "in strict pursuance of the powers conferred upon them, and the duties commanded by the provisions of said act, and after faithfully complying with all the directions of said act, duly and lawfully invited proposals," etc. This is not denied, and it is unnecessary to inquire into the question whether the act made it their duty, before selling or offering to sell to others, to offer the stock to the county courts of the several counties in which the roads were situated, or to inquire whether they performed other duties required by the act to be performed before a sale was made.

3. The appellant is not estopped by his application for and acceptance and use of the state proxies to vote the stock in 1872, or by his application for such proxies in 1873. Nor did these acts amount to a waiver of his rights under the contract, or to a recognition of the state as owner of the stock. The stock stood on the books of the companies in the name of the state, and no one not representing the state could vote it. If appellant was the purchaser he had a right under section 6 of the act, upon receiving a certificate of his purchase, to vote the stock; and not having such certificate, he required the state's proxies; and to apply for, accept, and use them was entirely consistent with the claim of ownership now asserted.

Any presumption of waiver or abandonment, or evidence of a recognition by the appellant of the state's ownership of the stock that might otherwise arise from or be furnished by his application for and acceptance of the state proxies in 1872, or from his application therefor in 1873, is fully rebutted by other facts in the record.

The proxies for 1872 were applied for and received before April of that year, and in December thereafter, as shown by the unanswered allegation of the cross-petition and the testimony of the auditor of public accounts, the appellant tendered the amount of his first bond, which is wholly inconsistent with his alleged waiver of the contract prior to the preceding April.

The governor testifies that appellant again applied to him for the proxies in January, 1873, which was not more than two months after the first installment was tendered, and he also testifies that he then refused to give appellant the proxies because he had learned that he was setting up claim to the stock, and that appellant then told him he had not determined whether he should contend for it or not. The governor also testifies that appellant had several conversations with him after the 7th of December, 1871, in reference to said roads, the state stock therein, his having bid for it and claim thereon, and the proxy of the state with reference to the election of directors, etc.

It is impossible, in view of these facts, to conclude that it has been proved that the appellant waived or abandoned the purchase.

4. It is next urged, as a reason for affirming the judgment, that the state holds the title to the stock, and not being subject to suit without legislative permission, and no such permission having been obtained, no judgment can be rendered requiring the transfer of the stock to the appellant; and, finally, that the act under which the sale was made having been repealed, the commissioners of the sinking fund have now no power to convey on behalf of the state.

We have already decided that the appellant acquired a right to the stock by accepting the modified terms proposed by the commissioners. That acceptance was prior to the passage of the repealing act, and his rights are unaffected by said act, unless it was in the power of the general assembly to divest him of a right already acquired and fixed. That no such power existed does not admit of question.

The constitution of the United States, as well as the constitution of this state, prohibits the enacting of any law impairing the obligation of contracts, and the constitution of this state also declares that the citizen shall not be deprived of his property except by due process of law.

These provisions apply as well where the state is concerned as between individuals, and the state can no more deprive the appellant of his rights under his contract with it than of his rights under a contract with a private person. The government and the citizen are alike bound by the fundamental law.

The act under which the stock was sold is a part of the contract, and the general assembly had no more power to repeal the act, and thereby render the contract unenforceable, than to enact that the agreement between the commissioners and appellant should be esteemed and held to be utterly void.

When the appellant purchased the stock he not only had a vested interest in so much of the act as authorized the commissioners to make that contract, but he had a like interest in that part of it which authorized them to transfer the stock to him upon the payment of the purchase-money. He can not sue the state, and if, after his purchase, the power of the commissioners to transfer the title can be revoked, he would be effectually deprived by indirection of a right that could not be taken from him by direct action. He may therefore sue the commissioners, and compel them to perform their duty under the act so far as may be necessary to secure to him the title to the stock, for to that extent the act is unrepealed.

In Blair v. Williams and Lapsley v. Brashears (4 Litt. 66), cases renowned in the judicial history of the state, Judge Mills said : " The obligation of a contract is then its binding power. It is that which compels its performance. In other words, it is, as defined by the Supreme Court of the United States (2 Wheaton, 197), *the law of the contract*. If, then," continues Judge Mills, " the contract was tolerated by the law in its inception, and was such as the law said should be binding, and the legislature of a state shall say that it shall not be binding, the act would contravene the constitution, and if they take away the remedy . . . the constitution is in like manner infracted. Any law, therefore, of a state which declares that

VOL. XI—29

legitimate contracts shall not be fulfilled according to their terms, or indirectly reaches the same object, must violate the obligation intended by the constitution."

We have seen that the appellant's contract for the stock and for its transfer to him upon payment of the purchase-money was not only "tolerated by the law in its inception," but was made under the law's express sanction, and consequently the law then said it was binding; and for the legislature to undertake afterward to say it shall not be binding, or indirectly to reach the same object by taking away the means of enforcing it, would contravene the constitution and fall directly within the reasoning of the court in the cases last cited, which reasoning triumphed over the passions and prejudices of the excited and debt-oppressed people of the state, after one of the longest and most bitter political contests ever witnessed in this commonwealth—reasoning which has been approved by the wisdom and experience of half a century.

The act under which the sale was made and the transfer is to be made must therefore be held to be still in force so far as its provisions are necessary to carry into complete effect the sales to the appellant. No relief can be granted against the state, and none is needed. It is clear that if no repeal had been attempted the courts could have compelled the commissioners of the sinking fund to transfer the stock upon payment being made, without granting any relief whatever against the state; and as the attempted repeal is ineffectual to destroy the right of appellant to have a transfer, it is equally ineffectual to deprive the commissioners of the power to make it, or to deprive the courts of the power to enforce performance of the contract.

Wherefore the judgment is reversed and the cause is remanded, with directions to adjudge the dividends in contest to the appellant, but to be paid into the treasury under the order of the court for the benefit of the sinking fund as a credit on

appellant's purchase, and upon payment of the balance of the purchase-money to cause the stock to be transferred to him in accordance with the act of March 7, 1871.

Chief Justice Peters did not sit in this case.