## JOBE v. CALDWELL.

### Opinion delivered January 17, 1910.

1. STATE—ALLOWANCE OF CLAIM AGAINST—VALIDITY.—When there is an available fund duly appropriated for the purpose of paying a claim against the State, the Auditor cannot question the validity or regularity of the acts of any other officer or tribunal authorized to pass upon and certify the justness of the claim covered by the appropriation. (Page 511.)

2. MANDAMUS—COMPELLING AUDITOR TO ACT.—The Auditor of State acts in a ministerial capacity in issuing warrants on certificates of an officer or tribunal authorized to pass upon and certify the justness of a claim covered by an appropriation, and can be compelled to act when he wrongfully refuses to do so. (Page 512.)

3. STATE—VALIDITY OF APPROPRIATION FOR CAPITOL.—The act of 1903, appropriating the sum of one million dollars for the purpose of completing the new State Capitol building, in so far as it undertakes to appropriate money for that purpose for a longer period than two years, is in conflict with Const. 1874, art 5, § 28, forbidding the Legislature to make an appropriation for a longer period than two years. (Page 512.)

4. SAME—CONSTRUCTION OF ACT FOR COMPLETING NEW CAPITOL.—Section 6 of the act of May 12, 1909, providing a sum "for the purpose of *com-*

*pleting* the work [on the new State Capitol] covered by the Caldwell & Drake contract, subject to the changes in this bill," makes an appropriation merely to carry forward the unfinished part of the work covered by the Caldwell & Drake contract, and does not provide for the payment of any sum claimed by Caldwell & Drake under their contract. (Page 513.)

5. SAME—STATE CAPITOL—ALLOWANCE OF CLAIM.—Under section 12 of act of April 20, 1909, providing a commission for adjusting the claims of Caldwell & Drake, the Auditor cannot be compelled to issue a warrant for a claim in favor of Caldwell & Drake which had been allowed by the original State Capitol Commission, created under the act of April 29, 1901, which had not been paid for want of an appropriation, and which was never allowed by the commission created by the act of 1909. (Page 513.)

Appeal from Pulaski Circuit Court, Second Division; *James H. Stevenson,* Judge; reversed.

*Hal L. Norwood,* Attorney General, and *C. A. Cunningham,* Assistant, for appellant.

1. Whether the Oldham and Patterson acts of the Legislature are constitutional or not is immaterial to the right decision of this case. This court has already held that an appropriation is void after the lapse of two years. 85 Ark. 171.

2. As to the Oldham Act, that statute "itself furnishes the best means of its own interpretation," and there is no need to resort to other means of interpretation. Sutherland, Stat. Const., § 237. But, if it is necessary to resort to other means to ascertain the legislative intention, then the court may look to public events of sufficient notoriety to be known to all men of reasonable information, to public documents, executive messages, proclamations and recommendations, and to legislative proceedings and journals. 76 Ark. 309. It is clear from the Patterson Act that the Legislature did not intend that the State should pay appellees anything more except such amount as the commission created by the acts should find to be due them after a hearing before the commission. It is also clear, from the third subdivision of section 12 of the Oldham Act, that suit should be brought against appellees if the commission should find they were due the State any amount.

*J. W. Blackwood* and *James P. Clarke,* for appellees.

1. When any tribunal or officer other than the Auditor has been appointed by law to consider the justness of claims against the State, and in pursuance of law certifies a claim to the Auditor,

his duty to issue the necessary warrant is merely ministerial, and he may be compelled to perform such duty by mandamus. 14 Ark. 700; 20 Ark. 540; 33 Atl. 453; 31 Pac. 614; 26 Pac. 383.

2. An appropriation is the setting apart from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and for no other. 69 N. W. 373; 50 Neb. 88; 61 Am. St. Rep. 538; 27 Ark. 129; 45 Cal. 149; 41 Pac. 1075; 11 N. W. 860; 21 N. W. 397; 22 Pac. 143; 62 Am. St. Rep. 764. The Legislature at the outset levied a tax, and thereby raised a fund which was dedicated to the completion of the new State Capitol. Acts 1901, p. 225, § 13; Acts 1903, p. 257, § 10. And the act of May 12, 1909 (Acts 1909, p. 730, § 6), is sufficiently comprehensive to include the demand presented by the certificate upon which the warrant was called for in this case. The phrase "for the purpose of completing the work covered by the Caldwell & Drake contract" is merely another way of stating that it was for the purpose of completing the new State Copitol. The claim here is for materials furnished and work done in furtherance of the completion of that building. Nothing in the act of 1909 evidences an intention to separate acts in furtherance of the completion of the new State Capitol into those that are to be paid, and those that are not to be paid, out of such appropriations; but, if susceptible of that construction, it is plainly to that extent unconstitutional, since the Legislature could not divert the fund, wholly or in part, from the purpose for which it was created. When one construction of a statute would not only render it a breach of faith on the part of the State but an invasion of constitutional rights of a party, the court is bound, if possible, so to construe the statute as to lay it open to neither of these objections. 118 U. S. 235. Courts will divest an appropriation act of all improper and illegal conditions which were beyond the contstitutional competency of the Legislature to impose, and will direct payment to the person entitled thereto, when all the laws on the subject are considered together. 13 L. R. A. 177.

3. For the purposes of this action, the act of 1903 is still in force. The appropriation in that act is comprehensive, continuing and perpetual, for the period required to complete and pay for the building of the new State Capitol. The Legislature

had the power to levy a specific tax to raise funds for that pur-
pose and to appropriate the same for a period coincident with the
full completion of the building, notwithstanding the two years'
limitation contained in § 29, art 5, Const. The opinion in *Moore*
v. *Alexander*, 85 Ark. 171, is *obiter dictum*, since it is evident that
the act of 1903 contains no provision making the *per diem* allow-
ance of the members of the State Capitol Commission a charge
upon the fund. There is no direction to pay the same from a par-
ticular fund, nor any direction to pay at all. Sections 1, 2 and 3
of the act; 36 Mo. 65; *Id*. 58; 19 R. I. 393. The opinion in *Moore*
v. *Alexander* is wrong, and should be overruled. It overlooks the
fact that the Constitution of 1874 provides two methods for the
payment of claims against, and discharging public obligations in-
curred by, the State—one by the allowance of a State tax therefor
and the other by an appropriation of money from some general
fund for this purpose. Sections 29 and 30, art. 5 and § 11 art. 16,
Const. The last named section supplies the rule in this case rather
than § 29, art. 5. If the provisions of the Constitution are irre-
concilable, it is for the Legislature, and not for the courts, to de-
termine which states the rule of action that must be observed. 13
Kan. 228; 7 Ind. 570; 44 S. W. 923. The State Capitol fund is a
trust fund. The circumstances under which that trust arose are
not the test of an immunity from the necessity for biennial
appropriation. It is the existence of the trust itself which protects
the fund from diversion to other purposes. 107 U. S. 565; 138
U. S. 655; 10 How. 219; 39 So. 792; 5 Neb. 278; 53 Pac. 1114.
As to origin of the time limit of an appropriation by constitu-
tional provision, see art. 1, § 8, clause 12, Const. U. S., and in this
connection see opinion of Solicitor General Hoyt, delivered Janu-
ary 2, 1904, approved by Attorney General Knox, wherein it
was held that the inhibition of the Constitution was limited to the
mere current "support" of the army, after the same had been
mobilized and equipped. Uniform usage of all departments of
the State government show that § 29, art. 5, does not apply where
the fund is raised by special tax. 15 Ark. 664; 37 L. R. A. 189.
See also 76 Ark. 197.

4. The Legislature had no power to repeal the appropriation
in the act of 1903, and thus defeat matured and certified demands.
Even if the Legislature in the act of 1909 had attempted in pre-
cise and comprehensive language to repeal the appropriation on

the faith of which the vested rights of appellees had accrued, such repeal would be wholly void as being in violation of our own Constitution and that of the United States providing that the State shall pass no law impairing the obligation of a contract. 16 Cal. 50; 30 Ill. 445; 70 Ark. 583; 81 Am. Dec. 199; 103 U. S. 358; 4 Pet. 514; 7 Cranch 164; 24 Ark. 319; 49 Ark. 193; 103 U. S. 5; 74 Ky. (11 Bush), 417; 89 N. Y. 45; 76 N. C. 199; 42 Ark. 244.

5. The State is estopped to set up, as against the payment of this claim, the invalidity of her purposely misleading legislation whereby she induced appellees to enter into a contract and to deliver to the State the value represented by the certificate which is the foundation of this action. 72 Ark. 195; 28 La. 460; *Id.* 121; 2 Herman on Estoppel, 1264, note 6; 11 Fed. 297.

MCCULLOCH, C. J. This is an action instituted by Caldwell & Drake in the circuit court of Pulaski County against John R. Jobe, Auditor of the State, praying for a writ of mandamus commanding that official to issue to them a warrant on the State Treasury for the sum of $18,899.54 in payment of vouchers issued by the State Capitol Commission, aggregating that sum, on their contract for constructing a new State Capitol building. The Auditor refused to issue the warrant, on the alleged ground that no appropriation of funds had been made by the General Assembly of the State for the payment thereof. The circuit court rendered judgment awarding a writ of peremptory mandamus, and the Auditor appealed to this court.

The Auditor bases his refusal to issue the warrant on a provision of the Constitution which reads as follows: "Sec. 28. No money shall be drawn from the treasury except in pursuance of specific appropriations made by law, the purpose of which shall be distinctly stated in the bill, and the maximum amount which may be drawn shall be specified in dollars and cents; and no appropriations shall be for a longer period than two years." Art. 5, Const. 1874.

The statutes concerning the building of the State Capitol, and levying a tax and making appropriation therefor, which bear on the present controversy, are as follows:

The General Assembly of 1903 passed an act entitled, "An act to provide for the completion of the State Capitol building, and for other purposes." Section 10 of that act contains the fol-

lowing provision: "That, for the purpose of raising funds to carry out the provisions of this act, the sum of one million dollars, or so much thereof as may be necessary, be and the same is hereby appropriated for the purpose of completing the new State Capitol building; and, in order to raise said sum, there is hereby appropriated all funds in the State Treasury heretofore collected for or appropriated as a State Capitol fund, and the tax of one-half of one mill on each dollar of taxable property now levied in accordance with the act provided for the completion of the State Capitol building, and for other purposes, approved April 29, 1901, shall be continued to be levied and collected and appropriated, as provided in said act until the said Capitol is fully completed." Acts 1903, c. 146.

The Commission created by this statute entered into a contract with Caldwell & Drake for the construction of the Capitol building at a stipulated price for the material and work, and the latter proceeded with the work of constructing the building. The vouchers in question were issued to Caldwell & Drake in October and December, 1907, after which the contractors ceased operations in the construction of the building before it was completed. Neither the General Assembly of 1905 nor of 1907 made any appropriation of funds for the purpose of completing the Capitol building.

The General Assembly of 1909 passed an act approved April 20, 1909, entitled "An act to create a Commission to adjust the controversy between the State of Arkansas and Caldwell & Drake, and for other purposes." This statute is commonly known as the Patterson Act, and its provisions may be summarized as follows:

Section 1. Relieves the Capitol Commission from further duties as such; discharges the architect of the building; cancels the contract with Caldwell & Drake.

Sec. 2. Creates a commission, composed of certain citizens, whose names are mentioned, to be known as "A commission to settle the controversy between the State of Arkansas and Caldwell & Drake," and provides that, "upon the organization of said commission, if Caldwell & Drake shall file with said commission their agreement in writing to accept its action in full settlement and satisfaction of all their claims, on account of their contract to erect the Capitol building, said commission will proceed to investigate the controversy, hear such testimony as it may deem

proper, and make such report as it may deem a just and equitable settlement of the whole matter, fixing the amount, if any, the State should pay Caldwell & Drake, and what amount, if any, Caldwell & Drake should refund to the State, if the commission finds they have been paid more than was justly and fairly due them."

Sec. 3. Provides procedure of the commission, etc.

Sec. 4. Commission to file report with Secretary of State, and copies with President of Senate, Speaker of House and Governor.

Sec. 5. Provides punishment of witnesses who testify falsely.

Sec. 6. Expenses of the commission to be paid by warrant on treasury.

Sec. 7. Governor to appoint counsel to represent the State before the commission.

Sec. 8. Faith of the State is pledged to abide by and carry into effect the acts of the commission.

The General Assembly of 1909 also passed an act, approved May 12, 1909, entitled, "An act to provide for carrying forward the work of the new State Capitol, and making appropriations therefor, and for paying any sum which may be found due the former contractors, and for the creation and appointment of a Capitol Commission and defining its duties, and for other purposes, to carry out the provisions of this act." This is commonly known as the Oldham Act. It provides for a new Capitol Commission, to be composed of the Governor and four other citizens, to be appointed by him, in the place of and as successor to the old commission. The sections of this act bearing on the present controversy are as follows:

"Sec. 5. It shall be the duty of the Capitol Commission to cause the new State Capitol to be completed according to the original plans and specifications, except as hereinafter provided. The commission shall, so far as is safe and practicable, retain the building now under construction. The said plans and specifications shall be subject to revision and alteration by the commission, and the architect shall make changes when required by the commission to do so.

"Sec. 6. For the purpose of completing the work covered by the Caldwell & Drake contract, subject to the changes in this

bill, the sum of three hundred and thirty thousand ($330,000) dollars is hereby appropriated out of any funds in the treasury to the credit of the State Capitol fund, not otherwise appropriated, or so much thereof as may be necessary. *  *  *

"Sec. 7. The Capitol Commission is hereby directed to perform these duties:

"(a)  To cause to be removed all the defective work and material and to replace the same in a substantial and workmanlike manner.

"(b)  To change the construction of the present building so that the hallways shall be lined with white marble, with a scagliola finish on all the interior columns. .  *  *  *

"(d)  To cause a proper water supply to be put in suitable places.

"(e)  To change the plans so as to substitute stone dome for copper dome.

"Sec. 8. For the purpose of carrying out section 7 of this act, the following additional sums are appropriated from the Capitol fund:

"For the marble in the hallways and scagliola finish on the columns, the sum of one hundred thousand ($100,000) dollars.

"For replacing the defective work and material, one hundred and seventy-five thousand ($175,000) dollars.

"For water connections, salary and expenses of the commission, architect and superintendent, secretary of the commission, and incidental expenses, the sum of seventy thousand ($70,000) dollars.

"For substituting stone dome for copper dome, one hundred and twenty thousand ($120,000) dollars.

"That the Capitol Commissioners be and they are hereby required to file an itemized account with the Auditor showing the actual cost by items of tearing out and replacing any defective work in the new State Capitol.

"Sec. 9. The commission is hereby authorized to use any unexpended balance of an appropriation for any item in this act to any other item herein where the appropriation for an item is insufficient, and such unexpended balances are hereby specifically placed in charge of the commission to use upon other items where

"Sec. 10. When the work is done under contract, said contract shall be publicly let; and notice of the letting shall be given by publication in at least one newspaper in Little Rock, one in Memphis, one in St. Louis and one in Chicago, for at least twenty days prior to the letting. The commission shall require bonds of the contractors, an amount double the amount to be received by them under such contracts, to faithfully perform their contract and discharge all debts for material and labor incurred under their contracts.

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Sec. 12. The Capitol Commission is hereby required to certify to the Auditor of State the amount which may be found due Caldwell & Drake by the commission to settle the controversy between the State of Arkansas and Caldwell & Drake, created by an act of the General Assembly, approved April —, 1909, known as the 'Patterson Act,' on account of Capitol construction, should said commission find any sum due them. Sufficient money to pay the award in favor of Caldwell & Drake by said commission, if it should be made, is hereby appropriated out of the Capitol fund. The Auditor is required to issue his warrant on the Treasurer in pursuance of the certificate of the Capitol Commission for the amount so certified, and the Treasurer shall pay the same or other warrants provided by section 4 of this act, as required to be paid. In the event the said arbitration commission should find any sum due from Caldwell & Drake to the State, suit shall immediately be brought against them on their bond.

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Sec. 15. The object and purpose of this act is to complete the new Capitol, except the terrace, power-house, heating and lighting, and the work below basement floor line, according to the appropriation herein made, and is to create a new commission in place of the Board of Capitol Commissioners and to provide for the substitution of other contractors and architect in place of Caldwell & Drake and Geo. R. Mann, whose contracts have heretofore been canceled, and are hereby canceled, set aside and held for naught, on account of their failure to comply with their respective contracts."

The only controverted question of law in this case is whether or not a valid appropriation has been made by the Legislature

for the payment of appellee's claim, evidenced by the vouchers issued to them by the former Capitol Commission. It is conceded by all that the plain letter of the Constitution forbids that any money be drawn out of the treasury except in pursuance of specific appropriations made by law. On the other hand, it must be conceded that when there is an available fund duly appropriated for the purpose, the Auditor cannot question the validity or regularity of the acts of any other officer or tribunal authorized to pass upon and certify the justness of the claim covered by the appropriation. He acts in a ministerial capacity in issuing warrants upon such certificates, and can be compelled by mandamus to act when he wrongfully refuses to do so. *Danley* v. *Whiteley*, 14 Ark. 687.

Learned counsel for appellees make two contentions as to there being an appropriation to pay this claim: First, that the appropriation made in the act of 1903 was a continuing one, which is still available; and, second, that section 6 of the Oldham Act of 1909 made an appropriation available for the payment of this claim.

The case of *Moore* v. *Alexander*, 85 Ark. 171, settles the first proposition adversely to this contention. We are asked to overrule that case or to distinguish it, on the ground that, as it involved a claim of one of the Capitol Commissioners for salary, it was unnecessary to decide whether or not the appropriation in the act of 1903 was a valid continuing one. We did, however, put that decision wholly on the ground that the appropriation was not a valid continuing one, because the provision of the Constitution hereinbefore quoted forbids an appropriation for a longer period than two years; and in effect we held that it was necessary to decide that question. Substantially the same arguments were made in that case as in this in support of the contention that the provision of the Constitution referred to above does not apply to appropriations made for such specific purposes as this. We have carefully re-examined the question, in the light of the very forceful and persuasive argument of learned counsel, but see no reason for changing the view expressed in the former opinion. We decline to overrule that case, and we treat the doctrine therein announced as the settled construction of the constitutional provision in question. The fact that the claim is one for work done under the building contract does not affect the question whether or not

the Legislature can make appropriations continuing for a longer period than two years. The Constitution, of course, takes cognizance of valid claims and no others, and it is to those claims that are applicable the inhibitions that "no money shall be drawn out of the treasury except in pursuance of specific appropriations made by law," and that "no appropriation shall be for a longer period than two years."

The other contention is that section 6 of the Oldham Act appropriates funds for the payment of these vouchers. Counsel for appellees very correctly, we think, define an appropriation to be "a setting apart from the public revenue of a certain sum of money for a specified object in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and for no other." Applying that test, does section 6 of the act appropriate any funds for this purpose? That section appropriates $330,000 "for the purpose of completing the work covered by the Caldwell & Drake contract, subject to changes in this bill." Considering the whole of the statute together, what does the language of this particular appropriation mean? Manifestly, it means, for the purpose of carrying forward and completing the unfinished part of the work covered by the Caldwell & Drake contract, subject to such changes as the commission might make under the authority of the statute. Sections 7 and 8 direct the commission to remove all defective work and material (meaning, of course, that already done which might be found to be defective), and appropriates $175,000 for replacing such defective work and material. These portions of the act look forward and not backward, and the Capitol Commission, under the provisions of the act, have nothing to do with Caldwell & Drake except, as provided in section 12, to certify to the Auditor the amount, if anything, found to be due them by the commission created by the Patterson Act.

Section 12 is the only part of the act which attempts to recognize any rights of Caldwell & Drake. Whether the appropriation attempted in that section was abortive because no maximum sum was mentioned, we are not called on to decide in the present case, as that appropriation was to pay an award of the commission created to settle the controversy, and it is not alleged that the controversy was ever submitted to the commission or any award made. Until the amount of claims be adjusted and certified in the

manner prescribed by the legislative branch of the government, the Auditor cannot be compelled by mandamus to issue a warrant, even if there be an appropriation.

"It cannot be doubted that the Legislature has the power by law to refer to her officers or agents, other than the Auditor, the settlement of accounts or claims against the State, and by whose decision, within the scope of their authority, the State may agree to become bound. * * * It appertains exclusively to the sovereign power to provide the mode and means by which the claims of public creditors are to be ascertained and liquidated, and, without the express consent of the State allowing herself to be sued, such a case is not one of judicial cognizance. Nor does the submission of the State to an ordinary suit at law for her alleged indebtedness change, in this respect, the theory of a mandamus. The assumption of such a jurisdiction over the accounting officers of the treasury would not only disturb their regular business, but it would have the effect of drawing indirectly to the courts the irresponsible power and impossible duty of regulating the fiscal affairs of the government." *Danley* v. *Whiteley, supra.*

It is argued with much earnestness that the words in section 6 of the act, "for the purpose of completing the work covered by the Caldwell & Drake contract," are sufficiently comprehensive to cover work already done, as well as that still to be done after the passage of the act. It is true that the precise meaning of the words "to complete" or "for the completion of" is sometimes uncertain and indefinite, and the idea intended to be conveyed by them may depend upon the connection in which they are used and the object to which they refer. The Supreme Court of Indiana, in construing a private contract, said: "The word 'complete,' as used, signifies the finishing of unfinished work, bringing it from the condition in which it then was to a state in which there was no deficiency. The instrument is not broad enough to include the laborers' claims preceding its date in the list of preferred creditors." *McElwaine* v. *Hosey,* 135 Ind. 481.

In Massachusets it was held that a contract to "cause to be fully completed" certain houses then unfinished, and to guaranty that said houses should be "fully completed and finished as aforesaid to the acceptance" of the owner, should be construed to refer only to the unfinished work, and not to prior deficiencies in

workmanship or material. *Hyannis Savings Bank* v. *Moors,* 120 Mass. 459.

The New York Court of Appeals, in an early case, construed a clause of the Constitution authorizing an annual appropriation of certain funds to the completion of canals to forbid the use of the funds in payment of interest on borrowed money. *Newell* v. *People,* 7 N. Y. 9.

Now, when we consider the Oldham Act as a whole, especially in conection with the Patterson Act, to which it expressly refers, can it be reasonably inferred that the framers of the act intended to appropriate any part of the $330,000 mentioned in section 6 to the payment of Caldwell & Drake for any work already performed by them? We think not. Such a construction would defeat the whole legislative scheme outlined and manifested in the statutes enacted during the same session concerning the State Capitol building, which was to abolish the former Capitol Commission, cancel the contract with Caldwell & Drake and create a tribunal to ascertain and adjust the state of accounts between the State and Caldwell & Drake, and to create a new Capitol Commission for the completion of the building, and to make appropriations for that purpose. We do not pause to consider now to what extent the cancellation of the Caldwell & Drake contract was valid, for the question is not presented; but the Legislature undoubtedly has the power under the Constitution either to make appropriations of funds for legitimate purposes, or to entirely withhold appropriations, however meritorious and lawful the demands against the State may be. And certainly we should consider the whole of these statutes, without stopping to determine how far they may be valid, in ascertaining the legislative intent in making the appropriation referred to.

We entertain no doubt as to the intention of the Legislature in this respect, and we hold that the appropriation in section 6 of the Oldham Act is not available for the payment of these or other claims of Caldwell & Drake for work done or material furnished under their contract prior to the passage of the statute.

The judgment of the circuit court is therefore reversed, and the petition for mandamus is dismissed.

WOOD, J., (dissenting). Appellees allege *"that plaintiff's under their contract did a large portion of the work"* on the State Capitol, that the Board of Capitol Commissioners, whose duty it

was under the law, had issued certificates to appellees showing the amount due them for work done, and that these certificates entitled them to warrants of the Auditor upon the Treasurer for the payment of the amounts aggregating $18,899.54.

The Auditor does not deny the facts set forth in the petition. On the contrary, by his demurrer he admits that the facts are true, and depends solely on the ground of no appropriation. Acts of the Legislatures of 1901 and 1903 had appropriated for the "purpose of completing the New State Capitol Building" the sum of one million dollars. Appellees entered into a contract with the State to do the work for a specified sum. The act of 1903, under which the contract was executed, after creating the Board of Capitol Commissioners, prescribes, among other duties, that "the said Capitol Commissioners shall certify to the Auditor of the State, from time to time, such sum or sums of money as may be due such persons as may have claims against the State under the terms of this act, and the person or persons in whose favor such certificate is issued shall be entitled to a warrant upon the treasury for the amount therein named, and the State Auditor shall draw his warrant for the same, and the Treasurer shall pay the same from the State Capitol Fund, appropriated by this act."

Appellees held their certificates issued under the authority of the above section. The Legislatures of 1905 and 1907 neglected to make the biennial appropriations. The Legislature of 1909 in the act of May 12 provides: "Sec. 6. For the purpose of completing the work covered by the Caldwell & Drake contract, subject to the changes in this bill, the sum of $330,000 is hereby appropriated out of any funds in the treasury to the credit of the Capitol fund."

At the time this appropriation was made there was $330,000 in the treasury to the credit of the Capitol fund. This money, under the Constitution, could only be used "for the purpose of completing the New State Capitol Building," since that was "the purpose for which it was levied." Acts of April 29, 1901, and April 16, 1903; § 11, art. 16, Const. 1874. The language of the acts of 1901 and 1903 making the appropriation is: "For the purpose of completing the new State Capitol Building." The act of 1909 uses the same language, except it substitutes the words "work covered by the Caldwell & Drake contract" for the words "New State Capitol Building." But the words in the several

acts mean precisely the same thing. If any significance beyond this could be given the words, "work covered by the Caldwell & Drake contract," it would be to show that the Legislature of 1909 had in mind specifically work that had been done by Caldwell & Drake under their contract, as well as work that was to be done by others in "completing the New State Capitol Building" according to the terms and specifications of the Caldwell & Drake contract, but "subject to the changes in the bill." The word "completing" in the act of 1909 means just what it meant in the acts of 1901 and 1903. The Legislature used the term "completing" in its ordinary sense. To "complete" means "to bring to a state in which there is no deficiency." Webster, Dictionary. When applied to a building, it includes everything from foundation to roof necessary to the finished structure. The language included, and was doubtless intended to include, an amount sufficient to pay appellees for the work that had been done by them in the building of the New State Capitol (for which they had not already been paid), as well as an amount to pay for the work to be done by others. Both were necessary for "completing the New State Capitol." The work that *had been done* was just as essential as the work *that was to be done.* The Legislature has made no distinction in the appropriation between liabilities incurred in the past and those to be incurred in the future in the work necessary for the completion of the New State Capitol, and certainly this court should make none. It seems to me that the only fair and reasonable construction of the language of the act makes it an appropriation to pay for *all the work* done and to be done "for the purpose of completing the New State Capitol Building." Thus construed, the act would not be under the ban of section 11, art. 16, of the Constitution inhibiting the diversion of funds. Otherwise it would be, for the Legislature could not, without a palpable diversion, exhaust the money in the treasury to the credit of the Capitol fund in appropriations to pay for certain parts of the work, and thereby exclude other parts equally essential to the "completed" building. For instance, the Legislature could not appropriate all the money in the New State Capitol fund to pay for the roof, and thereby refuse to pay for the foundation. But it is said that the intention not to make an appropriation to pay appellees appears when section 6, above, is considered, as it must be with other sections of the same act, and of the act of April

20, 1909. Let us see. The act of April 20, 1909, provides: "Sec. 1. * * * That the contract entered into between the State Capitol Commission and Caldwell & Drake, in August, 1903, for the erection of the Capitol building, be and the same is hereby annulled, cancelled and set aside."

Succeeding sections provide for a "commission to settle the controversy between the State of Arkansas and Caldwell & Drake," and its method of procedure, concluding by saying in section 8: "The faith of the State is hereby pledged to abide by and carry into effect the commission." The act makes no appropriation to pay appellees anything, if the commission should find in their favor, but in pledging the faith of the State to abide by and carry into effect the work of the commission it shows that the intention of the Legislature was to pay appellees whatever, if anything, might be due them. The act made it optional with Caldwell & Drake to submit their claims to the commission. It nowhere prescribes that the submission to the commission of their controversy with the State is a condition precedent to payment of whatever might be due them.

Section 12 of the Act of May 12, 1909, provides: * * * "Sufficient money to pay the award in favor of Caldwell & Drake by said commission, if it should be made, is hereby appropriated out of the Capitol fund." Certainly, this does not show an intention on the part of the Legislature not to make an appropriation to pay Caldwell & Drake whatever might be due them. By this section 12 the Legislature simply meant that, if any amount should be found due Caldwell & Drake in the manner there indicated, such amount should be paid out of the $330,000 already appropriated by section 6 "for the purpose of completing the work covered by the Caldwell & Drake contract," or the "New State Capitol Building."

Section 12 was not an appropriation in itself because it does not designate the maximum amount in dollars and cents which might be drawn to pay Caldwell & Drake. Sec 29, art. 5, Const. But the section does show indisputably that the Legislature believed it had already, in the prior section 6, made a sufficient appropriation to pay Caldwell & Drake whatever amount might be due them. Why else should the Legislature in the same section have directed a warrant to be drawn on the Treasurer for the amount due appellees? Such an act would have been the sheerest

folly .if there had not been an appropriation. It can not be said that section 12 excludes Caldwell & Drake from the appropriation made in section 6, under the doctrine of *expressio unius est exclusio alterius,* for, as I have shown, section 12 was not an appropriation at all, while section 6 was. The two sections harmonize, and they show clearly that the Legislature, in making an appropriation "for completing the New State Capitol Building," intended to include, and believed they had done so, the amount that might be due appellees for work done by them. Of course, it was not necessary to name the appellees any more than it was to name various other parties who had furnished or might furnish money, material and labor for the work of completing the New State Capitol. If the act was broad enough to compass appellees' claim without naming them or. designating the specific amount due them, it was sufficient to meet all the requirements of an appropriation act. To my mind a cogent argument in support of the view I have presented is that the Patterson and Oldham acts cancel the contract of Caldwell & Drake with the State and discharge them, substituting other contractors. It would have shown downright dishonesty in the members of the Legislature who passed these acts to have cancelled the contract of appellees with the State, without making some provision to pay them whatever amount might be due them for work they had done under and according to their contract. Futhermore, acts cancelling the contract and discharging the contractors, without in any manner recognizing the obligations of the State under the contract, would reveal the grossest ignorance of, or the most flagrant disregard for, constitutional provisions which the members of the Legislature had sworn to support and defend. Our State Constitution provides: "No law impairing the obligations of contracts shall ever be passed." Sec. 17, art. 2. The Constitution of the United States provides: "No State shall pass any law impairing the obligations of contracts." Sec. 10, art. 1. One of the obligations of the contract between the State and the appellees was that the State should pay them for the work done under the contract. Under the State and Federal Constitutions above quoted, the Legislature could pass no law impairing the obligations of the State to pay appellees for the work that had been done by them under the contract for the building of the State Capitol.

This is the law in our own and all jurisdictions having similar constitutional provisions: *McConnell* v. *Ark. Brick & Mfg. Co.,* 70 Ark. 568; *St. Louis, I. M & S. Ry. Co.* v. *Alexander,* 49 Ark. 193; *Berry* v. *Mitchell,* 42 Ark. 244; *Hawkins* v. *Filkins,* 24 Ark. 319; *Hall* v. *Wisconsin,* 103 U. S. 5; *Wolf* v. *New Orleans,* 103 U. S. 358; *State of New Jersey* v. *Wilson,* 7 Cranch, 164; *Providence Bank* v. *Billings,* 4 Pet. 514; *Danolds* v. *State,* 89 N. Y. 45; *Baldwin* v. *Commonwealth,* 74 Ky. (11 Bush) 417; *Clements* v. *State,* 76 North Carolina, 199; *Trustees* v. *Bailey* (Fla.), 81 Am. Dec. 199; *McCauley* v. *Brooks,* 16 Cal. 50.

It will not do to say that the Legislature, in the act cancelling the contract and creating the commission of arbitration, has made an appropriation to pay them whatever, if anything, that commission might have found to be due. For I have shown, if section 6 of the act of May 12, 1909, does not make an appropriation to pay them, then no appropriation whatever is made in the acts by which the contract has been cancelled.

Now, the State cannot be compelled to pay even her honest debts. For she can not be sued. But neither can she by legislation impair the obligations of any contract she has entered into. The one provision of the Constitution is as sacred as the other. She may, by the law under which her contract was made, or the law in existence at that time, designate the agents or tribunals that shall determine the amount that may be due under the contract. But when the agency or tribunal named by the contract and the law, which is a part of the contract, determines the amount, then she cannot by act of her Legislature repudiate her obligation to pay by cancelling the contract under which the obligation accrued. The obligations of every contract are fixed by the contract itself and the law under which it was executed. If the State differs with parties to the contract with her as to the amount due, she may through her Legislature appoint a commission to arbitrate the amount if the other party to the contract consents thereto. But she can not impose the condition that unless the other party to the contract submits to the arbitration she will cancel the contract. She can not shuttlecock from board to board the disputed claims of parties who contract with her. If she disputes the amount due and desires by affirmative action to have the matter determined, she must go, like any other suitor, into the tribunals provided by the Constitution for settling disputes arising out of

contractual obligations. If her legislative agents lay their hands upon a contract she has made to destroy it without in any manner recognizing the binding force of her obligations, their act in so doing is unconstitutional and void.

All this the Legislature knew. Unless impelled thereto by language the most imperative and unmistakable, we must so construe their acts as not to impeach their intelligence and integrity.

"Where one construction of a section of a statute would not only render the section a breach of faith on the part of the State (United States), but an invasion of the constitutional rights of the appellee, we are bound, if possible, so to construe the law as to lay it open to neither of these objections." *United States* v. *Central Pac. Rd. Co.*, 118 U. S. 235.

Hence I conclude that the act of May 12, 1909, makes an appropriation to pay appellees whatever amount might be due them. Whether or not the Oldham and Patterson acts are void notwithstanding the appropriation, I do not decide. For in my view of the case that question is not presented.

There being no controversy as to the justness and correctness of the claim of the appellees, the judgment of the lower court is right, and should be affirmed.