SCOUGALE v. PAGE.

4-4729

Opinion delivered June 14, 1937.

*Sam Robinson,* for appellants.

*Charles T. Coleman,* for intervener.

*Jack Holt,* Attorney General, *T. H. Humphreys, Jr.,* Assistant, and *Walter L. Pope,* for appellees.

WOOTEN, Sp. J. By act No. 11, of the General Assembly of Arkansas, approved February 4, 1927, the state declared its policy to take over, construct, repair, maintain and control all the public roads in Arkansas which comprised the system of state highways, as defined by the act.

At that time, many of the roads in the various counties, (mostly gravel roads) had been constructed, by the formation of improvement districts, under what was known as the Harrelson Act. (Act No. 5, Extra Session of 1923.) In order to raise revenue with which to pay for the construction, annual assessments were levied against the lands to be benefited, or, theoretically supposed to be benefited. Bonds, which became liens against the lands, necessarily had to be issued to provide the money with which to pay for the construction. At the time of the enactment of act No. 11 of 1927, the burden upon the lands had become heavy, and the Legislature, realizing that it was not just for lands along the highways to bear such an unequal load, agreed to make annual appropriations to the counties to aid in the payment of bonds and to maintain the highways. At the same time, certain sums were to be spent annually for the construction and maintenance of new roads, and to meet such needs, the state highway commission was authorized to borrow the necessary money, and to issue notes therefor to be known as state highway notes. Act No. 11 of 1927 required the state treasurer to set aside out of the first revenues collected from taxes on gasoline, motor oil and automobile licenses, a sum sufficient to pay the annual interest on state highway notes due during the year, which revenues were pledged by the state for that purpose. Proceeds from the sale of state highway notes were to be deposited to the credit of the state highway fund.

The well-known historical events which occurred subsequently are stated correctly and concisely in intervener's brief as follows:

"In 1933, the state defaulted in the payment of the current interest due on the highway bonds. The state was so financially distressed that it not only could not pay the interest on its highway obligations, but it was unable to meet some of the ordinary expenses of government. It was without funds to meet the expense of the legislative session; the penitentiary had accumulated an enormous debt; contractors' claims for construction of highways exceeded a million dollars; the charitable institutions were suffering for lack of funds; and the treasurer was unable to cash the warrants for the salaries of state officers. The highway bonds were selling on the open market at 30 cents on the dollar. The state of Pennsylvania had filed a suit in the Supreme Court of the United States against the state of Arkansas to collect highway bonds owned by it.

"In this situation, the governor appointed a committee to negotiate a refunding of the highway obligations. The holders of these obligations appointed a bondholders' committee to treat with the committee representing the state. The two committees met in Little Rock, and the negotiations covered a period of more than two months.

"The two committees realized that it would be useless to adopt a refunding program which the state would be financially unable to carry out. In view of the depleted revenues and enormous debts of the state, the bondholders' committee made concessions that were more than generous.

"The contract negotiated between the two committees, embodying the concessions made by the bondholders, was evidenced by a bill which they drafted in collaboration, which was passed by the legislature in 1934, and became act No. 11, approved February 12, 1934."

Section 2 of that act created an account to be known as the state highway fund. It, also, provided that the first charge on the state highway fund should be the cost of

maintaining the state highway system and the operation and maintenance of state toll bridges; for that purpose the state treasurer was required to transfer from the state highway fund to the state maintenance fund twenty-five per cent. of the total amount credited to the state highway fund during any fiscal year, such credit to be not less than $166,666 monthly, and to transfer not more than $100,000 during each fiscal year for the operation and maintenance of toll bridges; and to transfer during the fiscal year ending June 30, 1935, the sum of $60,000 to the general revenue fund, and to further transfer to that fund during each fiscal year thereafter the sum of $4,800; also, to transfer from the state highway fund to the auditorial fund the sum of $11,500.

Section 2 of act No. 11 of 1934, 2d Ex. Sess., after providing for the transfer of the foregoing amounts from the state highway fund for the purposes specified provides as follows:

"All highway revenue credited to said state highway fund in excess of the transfers and appropriations above provided for, shall next be applied in payment of interest upon the bonds and other obligations authorized to be issued or paid under the provisions of this act. * * * Any balance remaining after providing for the semiannual payments next to accrue, shall be credited to and paid by the treasurer of state into the following special accounts hereby created in the state highway fund for the purpose set forth below:

"(a) To a special account, to be known as the state highway refunding bond redemption account, in the years 1934 and 1935, 25 per cent.; in the year 1936, 50 per cent.; and annually thereafter 63.3 per cent., pledged for the payment or redemption of the principal of state highway refunding bonds, series A and B; state toll bridge refunding bonds, series A and B; and DeValls Bluff bridge refunding bonds in the manner hereinafter provided."

The section further provides that the remainder of such balance shall be credited to (b) a special account to be known as the road district refunding bond redemption account; (c) a special account to be known as the

funding notes redemption account; and (d) a special account to be known as refunding certificates of redemption account.

The same section then provides:

"Said special accounts provided for in subdivisions (a), (b), (c) and (d) of this section are hereby declared to be trust funds held in the state highway fund, pledged exclusively to the payment or redemption of the principal and interest of the respective obligations described in such accounts, and shall be applied solely as provided in this act.

"The transfer or appropriation of any money from the state highway fund, or from the state highway revenues, or of any funds arising from motor vehicle licenses, fees or taxes, or from taxes on gasoline, to or for any purpose other than as specified in this act, and expenses of collection, shall be deemed to be an immediate default on the part of the state with respect to the obligations authorized to be issued hereunder."

Section 3, act No. 11 of 1934, authorizes the issuance of state highway refunding bonds, series A, in the total sum not to exceed the amount of outstanding highway bonds and notes of the state theretofore issued under previous acts. For the payment of the bonds, with interest full faith and credit of the state and all of its resources were pledged.

Section 4 of that act authorizes the issuance of state toll bridge refunding bonds, series A, in a sum not to exceed the amount of such toll bridge bonds theretofore issued. Likewise, the full faith and credit of the state and all of its resources were pledged for the payment of those bonds.

Section 5 of that act provided for the exchange of old bonds for new bonds. The old bonds were to be deposited with and held by the treasurer of state in trust, uncancelled, as collateral security for the refunding bond for which it was issued. Upon default in the payment of either interest or principal, if such default should continue until two interest coupons attached to the bonds were past due and unpaid, the holders of such bonds would have the right to a return of the old bonds

or notes upon the surrender to and cancellation by the state treasurer of the refunding bonds.

Section 5 also contained the following: "No limitation of action shall begin to run against any state highway bond or note or state toll bridge bond deposited with the treasurer of state in pursuance of this act until a default shall occur in the payment of the principal or interest of the refunding bond issued in exchange therefor."

Section 6 provided for the issuance of road district refunding bonds, series A, in like manner as the issuance of the other two classes of bonds mentioned in § 5, as well as for the deposit of old bonds with the state treasurer, and the return of same upon default in payment of principal or interest on the refunding bonds. The same provision waiving limitation of action against the bond, or the lien of such bond, or of any assessments of benefits against lands of an improvement district, until a default should occur, was contained in that section.

Sections 11 and 12 provided for the issuance of refunding certificates of indebtedness to municipal and street improvement districts which had improved streets through cities and towns, which streets were a continuation of state highways.

Under § 22, the gasoline tax was raised from 6 cents to 6½ cents per gallon.

Under other sections various other forms of taxes against motor vehicle fuels, inspections, etc., were provided for.

Section 23 divided the net tax derived from motor vehicle fuel 92.3 per cent. as state highway revenue, and 7.7 per cent. as county highway improvement revenue, the funds to be segregated and used for those respective purposes.

Section 31 provided for the collection of motor vehicle fees.

Section 34 directed that the revenue from registration of motor vehicles should be credited to the state highway fund.

Section 36 required that funds arising from the operation of toll bridges should be credited to the state highway fund.

Under act No. 82, approved March 7, 1933, before the passage of act No. 11 of 1934, 2d Ex. Sess., there had been created what was known as the bond refunding fund. When act 11 of 1934, 2d Ex. Sess., was adopted there was a balance of $2,122,330.86 in the bond refunding fund.

Section 39 of act 11 of 1934, 2d Ex. Sess., provided that such balance in the bond refunding fund should be used for the following purposes:

Expenses of special session of the legislature which convened January 2, 1934—$36,000;

An amount equal to the unexpended balance of the appropriation made for the expenses of the audit commission by act 11, of September 2, 1933;

To the charities fund—$250,000;

For payment of maintenance and construction warrants and vouchers issued by the highway commission and unpaid on February 1, 1933—$620,861.70;

For payment of warrants and vouchers issued by highway commission for administration expenses unpaid on February 1, 1933—$44,231.41;

Expenses of the refunding board, $250,000, or so much thereof as might be necessary;

The remainder, to be used for the pro rata payment of construction warrants and vouchers unpaid on February 1, 1933, and certain short term notes and bonds issued under various acts of the legislature—$1,000,000.

Section 39 directed that if any balance should remain in the bond refunding fund after providing for the above allocations, such balance, together with all moneys deposited in the bond refunding fund since December 31, 1933, should be transferred to the state highway fund.

Section 44 reads: "In consideration of the concessions made by the creditors of the state as to amounts to be received, or in the interest rates or dates of payment of their respective obligations, by the acceptance of refunding obligations issued under the provisions of this act in exchange for their existing obligations, this act shall constitute a contract between the state and

such creditors, including the affected improvement districts, and the terms of such contract or contracts shall never be impaired by any subsequent legislation."

By § 48, the state expressly covenanted that so long as any of the obligations authorized by act 11 of 1934 were outstanding, it would not permit the repeal or amendment of § 23 or 24 (as amended by act 11 of 1934) so as to reduce, in any manner, the revenue therein provided for.

Under § 49, appropriations were made for various expenses for the refunding. The last paragraph of that section reads: "Should any part of the appropriation contained herein for any particular purpose be found unnecessary for the purpose mentioned, and not for any other, the board may, at its discretion, cause a transfer to be made from one item to the other."

Section 51 authorizes the refunding board to reduce the taxes on gasoline for any one year one-half to one cent per gallon if the revenue for the preceding year should exceed $10,000,000.

The General Assembly of Arkansas at its, 1937, session, adopted acts Nos. 130, 151 and 278, as a program for the refunding of the state's outstanding highway, toll bridge and road bonds.

The preamble to act No. 278, approved March 19, 1937, stated that "before the present highway obligations are paid off, under existing maturity tables, refunding would be inevitable in order to avoid default, resulting at that time in much confusion and great expense to the state, and that if the refunding acts adopted at the current session were carried to a successful conclusion, many millions of dollars would be saved to the state."

Section 6 of act No. 130 of 1937, provides, among other things, as follows: "The percentages of the state highway fund set aside and pledged for the payment of bonds under § 2, of the aforesaid act No. 11, shall be and remain as therein set forth, subject only to a reduction from time to time in proportion as the bonds secured thereby are exchanged or redeemed out of the proceeds of the general refunding bonds herein authorized to be issued, and the treasurer of state is hereby authorized to

make such reduction upon certification of the governor fixing the amount thereof.''

Under § 1 of act No. 151 of 1937, a board of finances was created, composed of the governor, the state comptroller, one member of the highway commission, to be chosen by the governor, the president of the Arkansas Bankers Association and one member from each of the seven congressional districts of Arkansas, to be selected by the governor by and with the approval of the senate, (a total of eleven members).

Section 1 of act No. 278 of 1937 reads: ''For the purpose of carrying out the provisions of acts Nos. 130 and 151 of the Fifty-first General Assembly of the state of Arkansas, and the provisions of this act, all proceeds of the sale of general refunding bonds shall be deposited in the state treasury to the credit of the general refunding bond redemption account and there is hereby appropriated out of any moneys which may be so deposited the sum of one hundred and fifty million ($150,000,000) dollars, or so much thereof as may be necessary, to effectively, efficiently, and speedily refund or refinance the obligations provided for in act No. 11 of the Second Extraordinary Session of the Forty-ninth General Assembly of the state of Arkansas, approved February 12, 1934.''

Section 3 of act No. 278 of 1937 is as follows: ''For the purpose of paying necessary expenses in connection with operations, the state comptroller is directed and authorized to cause a transfer to be made to the general refunding bond redemption account of any balance to the credit of the bond refunding fund, and allocated under the provisions of §§ 39 and 50 of act No. 11 of the Second Extraordinary Session of the Forty-ninth General Assembly, approved February 12, 1934, and of such additional sums as may be necessary from the appropriation made in § 1 hereof. Provided that under no circumstances shall the par value of funds received from the sale of general refunding bonds be used for the expenses of such refunding.''

Appellant, Scougale, filed his complaint in the Pulaski chancery court against the treasurer, the audi-

tor and the comptroller of the state of Arkansas, wherein he alleged that he had brought suit in his own behalf and on behalf of all other taxpayers of the state. He further alleged that the comptroller, acting under authority of § 3 of act No. 278 of 1937, had directed the state treasurer and state auditor to transfer upon their records $100,000 from the bond refunding fund to the general refunding bond redemption account for the use and expenses incident to issuing general refunding bonds under authority of the three acts of 1937 General Assembly; that there were more than $300,000 in the bond refunding fund at the time act No. 278 took effect; that under § 39 of act 11 of 1934, any balance remaining in the bond refunding fund, after paying expenses incident to the refunding provided for in act 11 of 1934, and other obligations mentioned in that section, was required to be transferred to the state highway fund; that all of the provisions of act 11 of 1934, by § 44 of that act, made an irrevocable contract between the state, the road improvement districts affected and those holding refunding bonds issued under the said act No. 11; that by § 2 of act No. 11, the transfer from or an appropriation of state highway revenues to or for any purpose other than as specified in said act No. 11, should be deemed to be an immediate default on the part of the state with respect to the obligations authorized to be issued under that act; that the board created under act No. 11 is still engaged in refunding bonds authorized under act No. 11 and that there were more than two million which had not been tendered for refunding; that if § 3 of act 278 of 1937 was enforced, the refunding board created by act 11 of 1934 would have no funds with which to carry on its work and complete the refunding contemplated by that act; that § 3 of act No. 278 of 1937, in so far as it provides for a transfer is void, because those funds were pledged and could not be used for any other purpose than those provided for in act No. 11 of 1934, and such transfer would impair the obligations of the contract by reason of § 10, Art. 1, of the Constitution of the United States, and the Fourteenth Amendment to the Constitution of the United States and § 17, Art. 2, of the Constitution of

Arkansas; also that such transfer would create a default on the part of the state and until the bondholders should surrender same and receive their original bonds; that such transfer would leave the Refunding Board without funds with which to carry on its work.

The complaint also alleged that § 3 of act 278 of 1937, was void upon the ground that the attempted appropriation did not distinctly state the various purposes of the appropriation, the maximum amount to be expended in dollars and cents and that the appropriation was not itemized, as required by § 29, Art. 5, of the Constitution of Arkansas.

The petition also alleges that § 1, act 278 of 1937 is void on the ground that the appropriation mentioned therein is not specific, the purposes not stated and the use to be made of the funds not definitely fixed, and the appropriation not itemized as required by § 29, Art. 5, of the Constitution of Arkansas.

It was also alleged that many employees would be necessary to carry out the provisions of the new acts; that the number of such employees and their salaries could be fixed by the Governor, subject to the approval of the Board of Finances, which would be an unwarranted unlawful delegation of power, in violation of § 4, Art. 16, of the Constitution of Arkansas.

The petition prayed that the defendants be restrained from transferring any funds from the Bond Refunding Fund to the General Refunding Bond Redemption Account, from issuing, approving or paying, under act 278 of 1937 any vouchers or warrants.

Appellant, See, filed his intervention in the cause, setting up that he owned real estate in one of the road improvement districts known as the Arkansas-Missouri Highway District, the bonds of which were a lien against his real estate; that if the terms of act 11 were enforced, intervener's real estate would be relieved of the taxes against his lands; he adopted all of the allegations in Scougale's complaint, except those in paragraph 1 thereof. He also prayed for the same relief asked in plaintiff's complaint.

Appellant, Burr, an owner of bonds issued under authority of act 11 of 1934, filed an intervention.

After reviewing pertinent sections of the various acts passed relating to the refunding of bonds, he alleged that there was now in the Refunding Bond Fund the sum of $382,783.46, which sum should be transferred to the State Highway Fund under the terms of act 11 of 1934.

He further alleged that in the negotiations of the contract between the state and holders of the highway bonds issued under act 11 of 1927, the bondholders agreed, in view of a deficiency of revenues for the payment of certain items of indebtedness which the state owed, and for a certain stated purpose, such as the expenses of a special session of the legislature, the payment of expenses incurred by the Highway Commission, a contribution of $250,000 to the charities fund and other items, that the permission to divert such revenues was a concession made by the bondholders in the negotiations of the contract evidenced by act 11 of 1934; that after the items had been paid, the balance of $382,783.46 in the Bond Refunding Fund, was pledged to the payment of obligations issued under that act.

The intervention sets out in detail the debits against the fund, as well as the allocations mentioned in §§ 39 and 50 of act 11 of 1934.

He alleged that the passage of acts Nos. 130, 151 and 278 of 1937 was in violation of the contract mentioned.

After referring to and quoting many sections of various acts, intervener alleged that the State Comptroller had directed the Treasurer and Auditor to transfer $100,000 in the Bond Refunding Fund to the General Refunding Bond Redemption Account, provided for in Act 130 of 1937, for the expenses incident to the refunding program contemplated by the latter act; that such officers were without legal authority to divert such revenue from the State Highway Fund because it was pledged to the payment of the obligations of the state.

He also alleged that act 11 of 1934 provided that the excess highway revenue in any year over debt service requirements should be used in purchasing outstanding

bonds at competitive offerings, known as the "distressed bond" provision; that the acts of such officers unless restrained would impair the operation of the "distressed bond" provision of act 11 of 1934, to the injury of the bondholders, without authority of law, and in violation of the contract.

Intervener alleges that the various diversions of the funds would impair the obligations of the contract between the state and the bondholders, in violation of § 10, Art. 1, of the Constitution of the United States, the Fourteenth Amendment to the Constitution of the United States, § 17, art. 2, of the Constitution of Arkansas and § 11, art. 16, of the Constitution of Arkansas.

He prayed that acts Nos. 130, 151 and 278 be declared unconstitutional; that the State Treasurer be enjoined from transferring any funds from the Bond Refunding Fund to the General Refunding Bond Redemption Account, or from paying any warrants drawn pursuant to acts 130 and 278; from transferring from the Bond Refunding Fund of the State Highway Fund any amount on account of the difference in the rate of interest to be borne by the bond issue under act No. 130 and that rate of interest borne by obligations issued under act No. 11 of 1934; that the Treasurer be enjoined from transferring any of the highway revenues from the State Highway Fund to the General Refunding Bond Redemption Account on account of the redemption or call in payment of obligations issued under act No. 11 of 1934, with the proceeds of bonds issued under act No. 130 of 1937; that he be enjoined from diverting any funds from the State Highway Fund to the payment of interest on General Refunding Bonds issued under act No. 130.

To the complaint and the interventions the defendants demurred upon the grounds that the court was without jurisdiction and that neither the complaint nor the interventions stated a cause of action.

The court sustained the demurrer and dismissed the complaint and interventions.

Appellees contend that this action, although instituted against individual state officers, is in reality a suit against the state of Arkansas, and, therefore, was pro-

hibited under § 20, Art. 5, of the Constitution of Arkansas, which says that "the state of Arkansas shall never be made a defendant in any of her courts."

We do not deem it necessary to pass upon that contention in considering and disposing of the appeal.

One of the grounds which appellants rely upon for a reversal of the decree is that the adoption of § 3, act No. 278, of 1937, (quoted above) by the General Assembly of Arkansas was an unwarranted exercise of legislative power in that it is an attempt on the part of the state to impair the obligation of the contract entered into between the state and owners of refunding bonds issued under the terms of act No. 11 of 1934. If it be true that the legislative act complained of did impair that obligation, then it would be of no effect and void under § 10, Art. 1, of the Constitution of the United States, the Fourteenth Amendment thereof, as well as § 17, Art. 2, of the Constitution of Arkansas.

"Impair" means to make worse; to diminish in quality value, excellence, or strength; to deteriorate. *Swineburne* v. *Mills,* 17 Wash. 611, 50 Pac. 489, 61 Am. St. Rep. 932; *Gladney* v. *Sydnor,* 172 Mo. 318, 72 S. W. 554, 60 L. R. A. 880, 95 Am. St. Rep. 517.

In *Lapsley* v. *Brashears,* 14 Ky. (4 Litt.) 47, it was stated that the word "impairing" in the Federal Constitution, prohibiting the passage by the states of any laws impairing the obligations of contracts, does not mean destroy; consequently, every state law which weakens the obligations of contracts previously made, or renders them less operative, is a violation of the provisions against the impairment of the obligations of contracts.

Whatever enactment abrogates or lessens the means of the enforcement of a contract impairs its obligations. *State* v. *Jumel,* 107 U. S. 711, 27 L. Ed. 448, 2 Sup. Ct. 128; *Holland* v. *Dickerson,* 41 Iowa 367.

If, therefore, the terms of act No. 11 of 1934 have not been substantially changed by the passage of acts Nos. 130, 151 and 278 of 1937, or any part thereof, by weakening the obligation of the contract embodied in act No. 11 of 1934, rendering the contract less operative, or a les-

sening of the means of enforcement of some right conferred on the bondholders by the, 1934, act, then there has been no impairment of the obligation assumed by the state under that act.

Appellants have not pointed to any provision in either of the refunding acts adopted by the General Assembly of 1937 which would indicate that any right possessed by the bondholders under act 11 of 1934 has been taken away from them. Under the new acts, the revenues arising from taxation of motor fuel, motor oil, inspections, bridge tolls, and car licenses have not been diminished, but are to be collected and distributed to the proper respective funds as required under the, 1934, act. With the advent of better times than existed in 1934, and the natural growth of the population of the state, necessitating a greater use of motor vehicles, oil and fuel it is safe to assume that the increase in the collection of revenues from those sources will materially strengthen the funds which are pledged to the payment of the bonds.

Sections 5 and 6, act No. 11 of 1934, remain unchanged. Those sections permitted the holders of the original notes and bonds to deposit the old bonds with the State Treasurer, who was required to hold them in trust until the refunded bonds were paid in full. It was, also, provided in those sections that no limitation of action should run against the original notes and bonds until a default should occur in the principal or interest on any of the refunding bonds taken in exchange therefor. Every remedy possessed under the original bonds, such as the enforcement of liens and assessments against the lands lying in the road districts, is still held by the owners of the original obligations. By the new refunding laws the full faith and credit of the state and its resources has been repledged.

The specific complaint lodged by appellants is directed against § 3, act 278 of 1937, hereinbefore quoted.

It is admitted by all parties that when act No. 278 of 1937 was approved there was a balance of $382,783.46 to the credit of the Bond Refunding Fund. Appellants insist that the transfer of such balance to the General Re-

funding Bond Redemption Account (set up under the 1937 laws) was an impairment of the obligation of the contract assumed by act No. 11 of 1934, for the reason that such balance was pledged under the, 1934, act toward the payment of the state's bonds.

To ascertain whether there is merit in such a claim, it is necessary to examine the circumstances which surrounded the enactment of the, 1934, act.

All parties agree, and the act itself reveals, that the adoption of the refunding program under act No. 11 of 1934 was the outgrowth of negotiations between committees representing the state and the bondholders. At that time, and before emerging from the depression, it was generally understood that some new plan for the refunding of the bonds would have to be evolved. The state's finances were at a low ebb, as the revenues had dropped to a considerable degree. Estimates were made of probable revenues during the biennial period, and that the revenues might be augmented, the tax of gasoline was raised one-half of one cent per gallon. The amount necessary to pay annual interest on the bonds and maturities during the succeeding years was agreed upon, and the percentages in the division of the revenues to be applied to the respective classes of bonds were fixed. The state was hard pressed to meet other obligations and expenses of the refunding program; taxes from motor fuel, oil, bridge tolls, and car licenses was the largest single source of revenue the state possessed. In those circumstances, the bondholders said in effect, ''If you will adopt the program we have outlined, which we believe will amply protect our bonds, we will relinquish any claim over the sum of $2,975,215.75, the money now in the Bond Refunding Fund, and you can exercise complete control over that sum.'' Accordingly, it was agreed by §§ 39 and 50, act No. 11, of 1934, that the state might divert to its own use from the Bond Refunding Fund $36,000 for the expense of the, 1934, Legislature; also an amount equal to the unexpended balance of the appropriation theretofore made for the expenses of the Audit Commission; to the Charities Fund, $250,000; for payment of Highway Commission construction warrants and notes, $620,861.70; for past

administration expenses of Highway Commission, $44,-231.41; for expenses of the Refunding Board, $250,000; contractors' claims, $1,000,000.

The bondholders were willing, in consideration of the adoption of the proposed refunding program, that the state might become the sole owner of the $2,975,215.75, and that they would look to the future revenue for payment of interest and maturities.

But, say appellants, after payment of the various items mentioned above, the balance was required to be transferred to the State Highway Fund under the concluding provision in § 39, act 11 of 1934, which reads: "Should any balance remain in the Bond Refunding Fund after providing for the above allocations, such balance, together with all moneys deposited in the Bond Refunding Fund since December 31, 1933, shall by the Treasurer of the State be transferred to the State Highway Fund."

When the allocations were agreed to, so far as the bondholders or any one else could foresee, every dollar in the Bond Refunding Fund might necessarily have to be utilized, and there might be no balance whatever. That being true, the bondholders' status would not be changed or injured, whether a balance remained or not, especially when by comparing the balance of $382,783.46 to the outstanding obligations of approximately $150,000,000, it will be seen that only one-tenth of two and one-half cents on each dollar would be available for payment on the obligations. We are led to the conclusion that the provisions regarding the transfer of any balance remaining in that fund was not inserted with the view of adding an additional substantial sum to the State Highway Fund for use in the payment of bonds, but that it was embodied in the act as a guide for bookkeeping, as any balance ultimately would have to be transferred to some other fund.

The bondholders had signified a willingness to relinquish possession over the whole fund and had agreed to its control by the state. It, therefore, could make no difference to them whether all or only a part of the sum appropriated was to be used. They had agreed to be satisfied with the revenues provided for in the law as the

source from which funds would arise with which to pay the bonds.

If the representatives of the state, by their diligence in compromising some of the claims against the Highway Department, saved some of the appropriation, we do not comprehend why any bondholder should object to the use of the balance in helping defray the expenses of a new program intended to further safeguard the security and payment of the bonds, especially when the amount of such balance would be insignificant and when the state's use of the balance would not reduce the security of bonds.

By the passage of the three acts of 1937, the state was not undertaking to repudiate its contract, or to breach any of the terms of the contract, but, on the other hand, to strengthen that contract, and to create a plan whereby the interest installments and maturities might be met.

It is a different situation than the one which arose in the case of *Hubbell* v. *Leonard*, 6 Fed. Supp. 145, (U. S. Dist. Court, E. D. of Ark.) cited by appellants. There the Legislature of 1933 undertook to so amend and repeal existing laws as to take money from the State Highway Fund and divert it to the various counties in the state for the purpose of aiding in the construction of "county roads." The court said: "There can be no doubt that the effect of the various acts of the 1933 General Assembly was to impair the obligation of these contracts. With commendable frankness this was admitted on oral argument." Our reference to that case must not be understood to imply that we agree with the ruling of the court upon the question of whether or not that suit was one against the state of Arkansas.

In our judgment, § 3, act No. 278 of 1937, which authorizes the transfer of the balance in the Bond Refunding Fund to the General Refunding Bond Redemption Account did not impair the obligation of the contract between the bondholders and the state.

We do not attach serious weight to the argument that there will be a discrimination in payment of bonds issued under the, 1934, act and those refunded under the new

acts, as $150,000,000 is appropriated under § 1, act No. 278, to be used for refinancing purposes. If intervener, bondholder, does not see fit to refund his bonds, we fail to see wherein he will suffer injury from the operation of the new laws.

The argument is advanced that the new acts will interfere with the "distressed bond" feature of act No. 11 of 1934, which appellants say operates to stabilize the market and maintain a higher market value for the bonds; that such an interference with or disturbance of that section, whereby the bonds will bring a lower price in the open market will be an impairment of the obligation of the contract. We do not concede that the "distressed bond" clause will be disturbed by the new law. However, it was embodied for the benefit of the state primarily.

Although the value of state bonds, like other bonds, may rise and fall on the open market, that would have no bearing on the question of the impairment of the state's obligation, as there was no undertaking on the part of the state to guarantee any particular market price for the bonds.

A further objection is interposed by appellants to the legality of § 3, act No. 278 of 1937, on the ground that the section attempts to appropriate moneys in a manner which violates two constitutional provisions of this state.

Section 29, art. 5, of the Constitution of Arkansas reads: "No money shall be drawn from the treasury except in pursuance of specific appropriations made by law, the purpose of which shall be distinctly stated in the bill, and the maximum amount of which may be drawn shall be specified in dollars and cents; and no appropriations shall be for a longer period than two years."

It is insisted that the proposed appropriation does not conform to the constitutional provision because it is not specific, nor is the amount thereof stated. No objection is made that there was a failure to state the purpose in the section.

The case of *Grable* v. *Blackwood*, 180 Ark. 311, 22 S. W. (2d) 41, is decisive of the proposition, as the court in that case had before it the same constitutional question

regarding an appropriation act. The court said: "An appropriation need not be made by any set words. It is the setting apart from the public revenues a certain sum of money for a specific object in such manner that the executive officers of government are authorized to use that money, and no more, for that object, and no other. *Clayton* v. *Berry*, 27 Ark. 129; *Jobe* v. *Caldwell*, 93 Ark. 503, 125 S. W. 423; *Dickinson* v. *Clibourn*, 125 Ark. 101, 187 S. W. 909; *Comer* v. *Blackwood*, 176 Ark. 139, 2 S. W. (2d) 44. * * * The appropriation (under consideration) is specific as to the purpose for which it is to be used. It is specific as to the time of payment, and as to the fund out of which it shall be paid. This was sufficient to constitute a valid appropriation."

When the act under attack in that case was adopted, it was not known just what claims were to be paid, but under the act they were to be ascertained by the Highway Commission at a future time. That made the appropriation too indefinite and uncertain, according to its challengers.

The purpose of the appropriation in § 3, act No. 278 of 1937, was the payment of the expenses to be incurred in the refunding operations; the appropriation was specific in that it was to be transferred from the Bond Refunding Fund, and such additional funds as might be necessary from the appropriation made in § 1.

When the bill, which later became an act, was first prepared, the author, realizing there would be a fluctuation of the balance in the Bond Refunding Fund at that time and at the time of approval of the act, (several weeks later) of course, could not name an exact amount. At the time this suit was instituted, the amount was known. Because the amount could not be ascertained at the time the bill was prepared, and for fear the balance might not prove sufficient for the expenses, it was deemed prudent to provide that any additional amount might come out of the larger appropriation contained in § 1 of the act.

*Dickinson* v. *Clibourn*, 125 Ark. 101, 187 S. W. 909, cited by appellants as sustaining their position that the

appropriation was not specific, covered a different state of facts. The act referred to in that case undertook to appropriate from the Game Protective Fund the expenses of the Game and Fish Commission and its employees, and for enforcing the game and fish laws. The court said the appropriation was not specific "when the amount that would probably be raised from the operation of the law was entirely contingent and altogether unknown."

Neither is the case of *Arkansas Game & Fish Commission* v. *Page, Treasurer,* 192 Ark. 732, 94 S. W. (2d), 107, in point. The court in that case held that § 2, act No. 194 of 1935, did not distinctly state the purpose of the attempted transfer of money from the Game Protective Fund, and was so uncertain and indefinite as to make it violative of the constitutional provision authorizing appropriations. A reading of the offending section shows that it failed to state where the sum sought to be transferred was to be placed, nor for what purpose.

Appellants urge that because the appropriation is not itemized and the number of employees and their salaries are to be fixed by the Governor and the Board of Finance, it violates § 4, Art. 16, Arkansas Constitution, which reads: "The General Assembly shall fix the salaries and fees of all officers in the state, and no greater salary or fee than that fixed by law shall be paid to any officer, employee, or other person, or at any rate other than par value; and the number and salaries of the clerks and employees of different departments of the state shall be fixed by law." In support thereof, *Pulaski Co.* v. *Caple,* 191 Ark. 340, 86 S. W. (2d) 4, is cited. The court in that case held that a deputy county clerk belonged to one of the departments of state enumerated in § 4, Art. 16, Arkansas Constitution, which required the General Assembly to fix his salary. An employee of the Refunding Board does not fall in that category. The distinction is pointed out in *Farrell* v. *Oliver,* 146 Ark. 599, 226 S. W. 529, where an appropriation for the maintenance of two of the state industrial schools, embraced in the general appropriation bill, was challenged, as violative of § 30, Art. 5, Arkansas Constitution, which provides: "The

general appropriation bill shall embrace nothing but appropriations for the ordinary expense of the executive, legislative and judicial departments of the state. All other appropriations shall be made by separate bills, each embracing but one subject.'' Those seeking to uphold the appropriation maintained that the schools were a part of the executive branch of the state. The court did not think so. It was there said: ''The control of such institutions is administrative and falls within the executive powers of government, but the control and maintenance is not a part of the expenses of the executive department of the state as defined by the Constitution.''

While, undoubtedly, the Legislature had the power to fix salaries of those engaged in the work connected with the refunding program, its failure to do so in making an appropriation to pay for such expenses should not, and in our judgment does not, render the appropriation illegal.

We hold that the action of the chancery court in sustaining the demurrer to the complaint and the interventions was correct, and the decree is, accordingly, affirmed.

GRIFFIN SMITH, C. J., BUTLER and BAKER, JJ., dissent.

McHANEY, J., disqualified and not participating.

GRIFFIN SMITH, C. J. (dissenting). The majority opinion sets out in detail the history of this litigation. It quotes from act No. 11 of 1934, and copies the salient parts of acts 130, 151 and 278, of 1937.

If full effect is given to act 278, rights heretofore created in certain creditors of the state will be impaired in that funds pledged to an account in which these creditors have an interest will be diverted to other purposes.

As set out in the majority opinion, the state's credit was at low ebb when the Forty-ninth General Assembly convened in January, 1933. Default in payment had occurred, a n d further default threatened. Act 167, approved March 28, 1933, was ineffective as an emergency measure because bondholders declined to refund under its provisions. The state of Pennsylvania filed suit against Arkansas in the United States Supreme Court, in which judgment against the state was asked. A suit by holders of highway bonds was brought in the

United States district court at Little Rock, as a result of which the State Treasurer was temporarily restrained from disbursing highway funds under act 167 and acts making appropriations in pursuance of the program therein provided for. A three-judge court sitting in Little Rock made the temporary order permanent. See *Hubble* v. *Leonard*, 6 Fed. Sup. 145. By consent, this permanent order was modified to permit payment of current expenses for highway maintenance.

With the state upon the one hand threatening to carry its fight to the supreme court of the United States, and with the bondholders on the other hand in control of a favorable decision which did not give them access to the state treasury or afford immediate means of realizing upon their advantage, conferences were entered into which resulted in promulgation of act 11, approved February 4, 1934.

Importance of the negotiations leading to enactment of this legislation should not be minimized. The result may be classified as a stupendous financial transaction— the state's greatest single venture in consolidating obligations. Refunding involved approximately one hundred and fifty million dollars in principal alone. Creditors then holding the state's bonds were asked to, and did, meet with representatives of the commonwealth and promises were given and assurance received affecting securities held by investors in virtually all of the forty-eight states. Savings accumulated through long years of economy; trust funds held by institutions for widows and orphans; bonds purchased by insurance companies with money pledged to the payment of death benefits— these and other interests were included in a program sanctioned by the state.

In meeting the issues squarely, bondholders made substantial concessions, particularly in refunding road improvement district obligations. These concessions, however, in view of prevailing economic conditions, were no more than the state had a right to ask, and the attitude of the state was not that of a supplicant begging to have its debts forgiven. On the contrary, it was admitted that during the easy period, so appropriately re-

ferred to as the "Fool's Paradise," promises had been too freely given, and the state's resources were not sufficient to discharge its debts in the order of their creation and in harmony with their terms. The state asked for time—a breathing spell—an opportunity to rearrange and reclassify its fiscal functions: in other words, a day of grace. The bondholders, both wisely and generously, acquiesced in the request—not as a matter of charity, but, rather, as an incident to changed conditions and business evolution.

We told our creditors, in all seriousness, and in all good faith, that the commitments made around the conference tables and later enacted into solemn law would remain inviolate—a monument to the fidelity of a people then striving to maintain the state's independence and its credit.

Section 44 of act 11 of 1934 makes that refunding measure a contract between the state and its creditors, and the solemn pledge is there given that the terms of the contract shall not be impaired by subsequent legislation.

One of the pledges made in that law was that any balance remaining in the bond refunding fund, after certain privileged payments had been made, would be transferred to the state highway fund created by § 2 of the act. With respect to this balance § 39 provides that "It shall, together with all moneys deposited in the bond refunding fund since December 31, 1933, be transferred by the treasurer of state to the state highway fund." The balance now identified as being in the bond refunding fund is $382,783.46. Although the promised transfer has not been made, equity, regarding that as done which ought to have been done, will treat this balance as standing to the credit of the highway fund.

By § 2 of act 11 of 1934 the first charge upon the state highway fund is maintenance of the state highway system to the extent of 25 per cent. of highway revenue. The section then provided for certain transfers to be made from the state highway fund. Remainder of the highway revenue in excess of the maintenance fund and transfer items was next to be applied to the payment of

interest upon the obligations authorized to be issued. Any remaining balance was to be credited to several special accounts, specifically set out in said section, for use by the state in purchasing highway obligations tendered under the terms of act 11 of 1934. It was further enacted that the special accounts "are hereby declared to be trust funds held in the state highway fund pledged exclusively to the payment or redemption of the principal and interest of the respective obligations described in such accounts and shall be applied solely as provided in this act."

It is first claimed that if effect is given to § 4 of act 130 and to § 3 of act 278, both of 1937, rights created and given under the provisions of act 11 of 1934 will be destroyed in violation of § 10 of article 1 of the federal constitution, and § 17, Art. 2, of the State Constitution. This contention should be sustained.

Act 130 of 1937, after providing for issuance of general refunding bonds, directs the treasurer of state, from and after the date of the sale or exchange of any general refunding bonds, and during each year while said bonds remain outstanding and unpaid, "to credit and pay to the special account hereby created in the state highway fund to be known as the general refunding bond redemption account and to charge against the state highway fund an amount equal to the annual savings and interest effected by the issuance of general refunding bonds thereunder, and likewise to credit and pay to the aforesaid general refunding bond redemption account and to charge against the particular redemption account from which those certain bonds refunded would otherwise be payable according to the provisions of aforesaid act 11 which created such account the portion of the total amount of the revenues pledged by said act 11 to the payment of principal of those certain bonds refunded."

Section 3 of act 278 of 1937 contains the following direction: "For the purpose of paying expenses in connection with refunding operations the state comptroller is directed and authorized to cause a transfer to be made to the general refunding bond redemption account of any balance to the credit of the bond refunding fund and

allocated under the provisions of §§ 39 and 50 of said act 11 aforesaid, and of such additional sums as may be necessary from the appropriation made in § 1 hereof." Section 1 of act 278 of 1937 provides that "All proceeds of the sale of general refunding bonds shall be deposited in the state treasury to the credit of the general refunding bond redemption account and there is hereby appropriated out of any moneys which may be so deposited the sum of $150,000,000 or so much as may be necessary to effectively, efficiently and speedily refund or refinance the obligations provided for." This section refers to and identifies acts 130 and 151 of 1937 and undertakes to tie the three enactments together.

The majority opinion disregards the fact that by § 4 of act 130 an amount equal to the difference in the interest rate of the new bonds and the refunded bonds, and a part of the sinking fund created by § 2 of act 11 of 1937, will be transferred from the highway fund to the general refunding bond redemption account.

If any money is transferred (as provided for in § 4 of act 130 of 1937) before all of the obligations issued under act 11 of 1934 are redeemed or retired, the holder of bonds will be deprived of substantial rights in violation of § 10, article 1, of the federal constitution and § 17 of article 2 of the State Constitution.

Section 3 of act 278 of 1937 authorizes and directs the transfer to the general refunding bond redemption account of any balance to the credit of the bond refunding fund as allocated under the provisions of §§ 39 and 50 of act 11 of 1934. The amount standing to the credit of the bond refunding fund has been pledged in trust to the payment of the bonds issued under act 11 of 1934. The transfer and use of this balance for any purpose other than as specified in act 11 is an impairment of the contract between the state and the holders of outstanding bonds.

The majority opinion holds, in effect, that even though this balance may be a trust fund pledged to the state's creditors, the state's culpability is slight because the ratio of $382,783.46 to $150,000,000 shows a diminishing degree of importance.

The philosophy of appropriation seems to be that if Peter must part with his worldly possessions to prepare a place for Paul, it may be presumed that Peter's lamentations will not be heard at a great distance when he grasps the explanation that the amount taken in comparison with the remainder is not sufficient to render him a bankrupt.

The supreme court of the United States in the case of *Bank of Minden* v. *Clement*, 256 U. S. 126, 65 L. ed. 857, speaking of the degree or extent of impairment of contract, said: ''One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not, by the Constitution, to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligations—dispensing with any part of its force.'' (See also cases cited in the opinion.)

The General Assembly does not possess the constitutional power to take any part of the trust funds created and dedicated by § 2 of act 11 of 1934, or to take $382,-783.46 from a fund dedicated to the state's creditors in trust. If such conduct is to be approved because economies may be effected, then it would seem that salvation is being purchased at too great a price: the result is that honorable dealings are being sacrificed at the whim of expediency.

But, it is argued that there is no violation of either the state or federal constitutions because the term ''impair'' means ''to make worse, to diminish in quality, value, excellence or strength, or to deteriorate.'' Therefore, say proponents of abrogation, the arbitrary taking of nearly $400,000, contrary to the provisions of an expressed trust, does not impair the obligations because it is the intent, immediate or remote, of those charged with administrative duties, to strengthen the security of bondholders, to improve the quality of their holdings, to increase existing values, and to endow with attributes of excellency in contradistinction of impairment.

This argument would have more merit if those with whom we entered into contractual relationship were parties to the change. In the absence of acquiescence it

may be suggested that the state is abandoning its status as trustee of highway funds for a trusteeship of the conscience and business judgment of bondholders who thought at least that act 11 of 1934 was not susceptible of the strange construction to which it is now being subjected that an advantage of the hour may be attained.

It is next contended by appellants that the appropriation of funds attempted by § 3 of act 278 of 1937 violates § 29, Art. 5, of the state constitution. This contention should also be sustained. This section of the Constitution reads as follows: "No money shall be drawn from the treasury except in pursuance of specific appropriations made by law, the purpose of which shall be distinctly stated in the bill and the maximum amount which may be drawn shall be specified in dollars and cents and no appropriation shall be for a longer period than two years."

The appropriation made by § 3 of act 278 of 1937 does not specify in dollars and cents the maximum amount that may be used for the purpose of paying expenses of refunding. The majority opinion says: "When the bill, which later became an act, was first prepared, the author, realizing there would be a fluctuation of the balance in the bond refunding fund at that time, and at the time of the approval of the act (several weeks later), of course, could not name the exact amount."

The language clearly indicates that the legislature did not fix in dollars and cents the maximum amount that might be used for expenses of refunding; yet, notwithstanding that fact, and in opposition to § 29, Art. 5, of the Constitution, the stamp of approval has been put upon the appropriation.

The case of *Grable* v. *Blackwood,* 180 Ark. 311, 22 S. W. (2d) 41, is cited in the majority opinion. A study of the Grable case discloses that instead of being an authority supporting the results in the instant case, it is authority to the contrary.

The Grable case recognizes the force and effect of § 29, article 5, of the Constitution. The court held that the maximum amount that might be expended under the

act attacked in the Grable case and under act 18 of 1937 was specifically fixed at $7,500,000.

In the case at bar the legislature has authorized an expenditure (1) for the purpose of purchase and redemption of bonds issued under act 11 of 1934, and (2) for the payment of expenses of refunding under act 130 of 1937. That expenditure is the definite sum of $150,-000,000 plus an unknown and indefinite amount to be transferred from the bond refunding fund. There is a provision that no part of the $150,000,000 shall be used for expenses until after the indefinite and unknown amount is exhausted. The sum of a known and unknown amount is unknown.

The appropriation made by § 3 of act 278 of 1937 does not comply with § 29, article 5, of the Constitution.

It is conceded that $150,000,000 appropriated by § 1 of act 278 of 1937 is legally appropriated. If this were the only appropriation contained in acts 130, 151 and 278 of 1937, and if there had been a provision that expenses of refunding should be paid from this appropriation under the rule announced in the Grable case, the appropriation would be constitutional, but the appropriation made by § 3 of act 278 of 1937 operates upon a balance in the bond refunding fund and this balance was not definitely fixed by the legislature.

Appellants next contend that even though the appropriation made by act 278 of 1937 is valid, no part thereof can be disbursed for salaries, fees or commissions to those assisting in the refunding program. This contention should also be sustained.

Section 4 of article 16 of the Constitution reads as follows: "The General Assembly shall fix the salaries and fees of all officers of the state and no greater salary or fee than that fixed by law shall be paid to any officer, employee or other person, or at any rate other than at par value, and the number and salaries of the clerks and employees of different departments of the state shall be fixed by law."

In *Nixon* v. *Allen,* 150 Ark. 244, pages 257-258, 234 S. W. 45, this court said: "The power to fix the salaries and fees of all officers in the state and the number of

their clerks and employees and their salaries is a function which, within the limitation of the Constitution, is lodged in the supreme law-making power of the state— the legislature. The General Assembly cannot delegate this legislative power to any individual officer or board." The court, in *Pulaski County* v. *Caple,* 191 Ark. 340, 86 S. W. (2d) 4, reaffirmed the rule announced in the Nixon case.

The majority opinion, however, says that an employee of the refunding board is not within the restrictions found in § 4, article 16, of the Constitution. The reference is to those departments into which the powers of the government of the state are divided by § 1, article 4, of the Constitution, where it is provided that all the powers of the government of the state of Arkansas are divided into legislative, executive and judicial departments.

If the bonds to be issued are to be obligations of the state of Arkansas, their issuance must be exercised by some governmental power, and this power must be exercised by someone employed in one of the three departments of state. Issuance of bonds will be an administrative function and such duties will necessarily fall within the executive powers of the government. See *Farrell* v. *Oliver,* 146 Ark. 599, 604, 226 S. W. 529.

If it be admitted, for the sake of argument, that an employee of the board of finance is not an entity in one of the departments of state, even then such employee could not be paid a salary in excess of that fixed by the legislature, because § 4, article 16, of the Constitution prohibits the payment of any greater salary or fee *"to any officer, employee or other person"* than that fixed by law. Those engaged in refunding, if arbitrarily excluded from a departmental classification, would at least attain the dignity of *"employees or other persons."* Since the legislature has not fixed the salaries or fees of those who will be engaged in refunding, no funds can be legally paid from the appropriations made by acts 130, 151 and 278 of 1937 for salaries, commissions, fees, or personal services even though the appropriations were valid. If a construction to the contrary is adopted, then an im-

portant safeguard against treasury-tapping has been removed:

It is the view of the writer of this opinion, concurred in by Mr. Justice BUTLER and Mr. Justice BAKER:

(1) That the balance of $382,783.46 standing to the credit of the bond refunding fund is properly a credit to the highway fund created by act 11 of 1934.

(2) That such balance is a trust fund and that its diversion to any purpose inconsistent with the trust would impair the obligation of the contract between the state and its creditors and such diversion is, therefore, prohibited by both the federal and state Constitutions.

(3) That the transfer of any moneys from any of the accounts created in the state highway fund by § 2 of act 11 of 1934 to the general bond refunding account as provided in § 4 of act 130 of 1937 would impair the obligation of the contract between the state and its creditors, and such transfer is, therefore, prohibited by both the federal and state Constitutions.

(4) That the relief prayed for by appellants and the methods provided for its procurement are not suits against the state, but on the contrary they are suits by taxpayers for the benefit of all taxpayers similarly affected, and to that extent are suits by the state and not against it.

(5) That the state has no interest in any unconstitutional enactment of the General Assembly, and such enactment should not be enforced by any officer or other agent of the state; therefore, injunction will lie to prevent an exercise of nonexistent authority.

(6) That act 278 of 1937 is not unconstitutional as to the appropriation of $150,000,000, nor is it unlawful for the state comptroller to transfer funds from the general refunding bond redemption account for use in any constitutional manner; provided, no part of the principal arising from the sale of bonds is transferred; and provided, further, that in no event can any part of the item of $382,783.46 be transferred or used except as authorized in §§ 39 and 50 of act 11 of 1934.

(7) That no part of the funds appropriated by any of the acts mentioned can be used for the purpose of

paying salaries, fees, or commissions to persons engaged in the furtherance of the refunding plan because such salaries, fees and commissions have not been fixed by the legislature as required by § 4 of article 16 of the Constitution.